## IN THE CIRCUIT COURT
## FOR BALTIMORE CITY, MARYLAND

**DANIELLE BROWN**
*Individually and as the Personal Representative*
*of the Estate of Donnell R. Rochester*
c/o Hansel Law, P.C.
2514 North Charles Street
Baltimore, Maryland 21218

        *Plaintiff,*

   vs.

**STATE OF MARYLAND**
     Serve:  Nancy K. Kopp
              State of Maryland
              Treasurer's Office
              80 Calvert Street
              Goldstein Treasury Building
              Annapolis, Maryland 21401

and

**MAYOR AND CITY COUNCIL OF THE**
**CITY OF BALTIMORE**
100 North Holliday Street
Baltimore, Maryland 21202

and

**BALTIMORE POLICE DEPARTMENT**
601 East Fayette Street
Baltimore, Maryland 21202

and

**OFFICER CONNOR MURRAY**
*Individually and in his Official Capacity as*
*a Baltimore City Police Officer*
601 East Fayette Street
Baltimore, Maryland 21202

        *Defendants.*

**\*Jury Trial Demanded\***

C-24-CV-25-001552
**Civil Case No.** _____

## COMPLAINT AND JURY DEMAND

COMES NOW the Plaintiff Danielle Brown, *Individually and as the Personal Representative of the Estate of Donnell R. Rochester*, by and through attorneys Cary J. Hansel and the law firm of Hansel Law, PC, and sues the above-named Defendants, and as cause therefore state as follows:

## INTRODUCTION

1.      This action arises from the unjust, unconstitutional, unnecessary, and disproportionate death of Donnell R. Rochester during an arrest.

2.      Baltimore City police officers located Mr. Rochester after running his vehicle's license plates during a routine patrol and identifying that Mr. Rochester had open warrants for his arrest.

3.      Responding officers, including Defendant Murray, initially lost sight of Mr. Rochester's vehicle after their first attempt to conduct a traffic stop. The officers soon located Mr. Rochester's vehicle again while it was parked on a street in a nearby residential neighborhood.

4.      The officers, including Defendant Murray, parked their patrol cars to approach Mr. Rochester on foot. When Mr. Rochester saw the officers, he returned to his vehicle and climbed into the driver's seat.

5.      The officers then ran to Mr. Rochester's vehicle. Defendant Murray, in direct violation of Baltimore City police regulations which prohibit an officer from positioning themselves in the path of a moving vehicle where the officer may have no option but to use lethal force, decided to place himself directly in front of Mr. Rochester's vehicle.

6.      Mr. Rochester, a terrified 18-year-old Black man surrounded by police officers, attempted to drive away.

7.      Despite having the time and opportunity to move himself to a safe location, and despite Baltimore City police regulations and policies mandating that police officers avoid unduly jeopardizing their own safety or the safety of others through poor tactical decisions, Defendant Murray remained in the path of Mr. Rochester's vehicle.

8.      Despite having the time and opportunity to use de-escalation techniques, and despite Baltimore City police regulations and policies requiring that officers use these techniques to minimize the likelihood that force would be required, Defendant Murray instead chose to create a situation where he immediately used lethal force.

9.      As Defendant Murray stood in the path of Mr. Rochester's vehicle without moving towards safety, he fired three shots at the vehicle. None of these shots hit Mr. Rochester.

10.     As the front of the vehicle passed Defendant Murray without hitting him, Defendant Murray fired a fourth shot through the front passenger-side window. At this time, neither he nor any other person was, or reasonably could have been, in imminent fear of death or bodily harm.

11.     When the fatal shot was fired, Mr. Rochester posed no imminent threat to Defendant Murray, the other officers on scene, or any other individual. Defendant Murray's choice to use lethal force was unjust, unconstitutional, unnecessary, and disproportionate.

12.     The fourth shot struck Mr. Rochester in the right tricep and traveled into the right side of his chest, resulting in Mr. Rochester's untimely and unjustified death.

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction pursuant to Md. Code, Cts. & Jud. Proc. § 6-102, as Defendants are domiciled in the State of Maryland and/or are organized under the laws of Maryland and have their principal place of business in the State.

14.    Venue is proper in this forum pursuant to Md. Code, Cts. & Jud. Proc. § 6-201(a) as the named Defendants carry on their principal place of business in Baltimore City, Maryland.

15.    Plaintiff provided notice of his claim on or about March 7, 2022, via certified mail, return receipt requested, within one year of the date of the incident which is the subject of this lawsuit, as required by Md. Code, Cts. & Jud. Proc., § 5-304. However, no notice is required in this case due to the timely police investigation and report.  All conditions precedent for the filing of this suit have been satisfied.

## PARTIES

16.    Plaintiff Danielle Brown ("**Plaintiff**"), individually and as the Personal Representative of the Estate of Donnell R. Rochester, is the mother of Decedent Donnell R. Rochester ("**Mr. Rochester**") and an adult resident of Maryland.

17.    Defendant State of Maryland ("**Defendant State**") is a body politic and corporate body that may sue and be sued and has waived any applicable sovereign immunity in accordance with the Maryland State Tort Claims Act under Md. Code, State Gov. § 12-104. Defendant State was responsible for the hiring, training, supervision of Defendant Murray, and all employees and/or agents of Defendant BPD.

18.    Defendant Mayor and City Council of the City of Baltimore ("**Defendant Baltimore**") is a body politic and corporate body that may sue and be sued and has waived any applicable sovereign immunity in accordance with the Local Government Tort Claims Act under Md. Code, Cts. & Jud. Proc. § 5-301, et seq.

19.    Defendant Baltimore Police Department ("**Defendant BPD**") is an agency of Defendant State of Maryland and named as a "local government" for purposes of this lawsuit pursuant to Md. Code, Cts. & Jud. Proc., § 5-301(d)(21).

4

20.     Defendant Officer Connor Murray ("**Defendant Murray**") is an adult resident of Maryland whose principal place of business is Baltimore City, Maryland. At all times relevant to the occurrence complained of herein, Defendant Murray was acting under color of law and within the scope of his employment with Defendant BPD, an agency of Maryland.

## FACTS COMMON TO ALL COUNTS

21.     On February 19, 2022, Officers Robert Mauri and Antoine Galloway were on patrol near the intersection of Belair Road and Erdman Avenue in Baltimore.  They were part of BPD's Mobile Metro Unit. While on patrol, Officers Mauri and Galloway were running vehicle license plates using their in-car computer.

22.     At approximately 3:10 p.m., Officers Mauri and Galloway ran the license plate of Mr. Rochester's car and discovered that Mr. Rochester had open warrants for failing to appear at a court date on a carjacking charge and for an alleged robbery.

23.     The in-car computer also displayed two photos of Mr. Rochester. Officers Mauri and Galloway pulled alongside Mr. Rochester's car and identified the driver as Mr. Rochester.

24.     Officers Mauri and Galloway also saw an unidentified female passenger.

25.     Officers Mauri and Galloway followed Mr. Rochester's vehicle. Before attempting to pull Mr. Rochester over, the officers reported over radio that "It's an individual with multiple warrants, including robbery and carjacking. I believe the driver is in the driver's seat, occupying the vehicle. I haven't tried to attempt a stop yet."

26.     As Officers Mauri and Galloway followed Mr. Rochester's vehicle west on Erman Avenue, south on Harford Road, and north on Tivoly Avenue, the officers were joined by a marked patrol SUV. The marked patrol SUV was being driven by Defendant Murray, with Officer Joshua Lutz in the passenger seat.

27.    On Tivoly Avenue, Officer Mauri activated his emergency lights. Officer Galloway later reported that Mr. Rochester's vehicle initially "slow-rolled," neither stopping nor accelerating, before accelerating away. The officers then reported by radio that "he's taking off."

28.    Officer Mauri then deactivated his emergency lights and the officers continued to follow Mr. Rochester's vehicle from a distance of approximately 400 to 600 feet.

29.    As an internal investigation report later concluded, the officers did not initiate a vehicle pursuit at this time because the officers did not have any reason to believe that Mr. Rochester posed an immediate threat of death or serious bodily injury to officers or others at the time, a requirement to initiate such a pursuit under BPD's policies.

30.    The officers temporarily lost sight of the vehicle but Officer Galloway saw the vehicle again when they drove by Chilton Street.

31.    Officer Mauri turned right on East 33rd Street, then right on Hillen Road, and stopped the patrol car at the intersection of Hillen Road and Chilton Street.

32.    Defendant Murray and Officer Lutz, who had turned right on either East 29th or East 31st, then left on Fenwick Avenue, saw the Honda as they passed Chilton Street. Upon seeing the Honda, Officer Murray stopped, backed up, and turned down Chilton Street. Officer Murray drove the length of the 1800 block of Chilton Street, then stopped in the middle of Chilton Street.



(A) the location of Mr. Rochester's Honda when the officers arrived; (B) the location at which Officers Murray and Lutz stopped their vehicle; and (C) the location at which Officers Mauri and Galloway stopped their vehicle.

33.    Officers Lutz and Galloway exited their vehicles and saw Mr. Rochester on foot. When Mr. Rochester saw the officers, he turned around and ran back to his vehicle.

34.    The female passenger who had been riding with Mr. Rochester was also running towards Hillen Road and did not return to the vehicle.

35.    After Officers Lutz and Galloway exited their patrol cars, they ran towards Mr. Rochester's vehicle's passenger- and driver-side doors, respectively.

36.    Defendant Murray and Officer Mauri followed, with Defendant Murray running down the center of Chilton Street, directly towards the front of Mr. Rochester's vehicle, and Officer Mauri running down the sidewalk on the north side of Chilton Street.

37.    Defendant Murray and Officers Galloway and Mauri drew their service weapons as they ran towards Mr. Rochester's vehicle. Officer Lutz did not.

38.    As they ran, Officer Galloway yelled, "Get out of the car now!" several times.

39.    Defendant Murray yelled, "Stop it! Stop the car! Stop the car!"

40.    As he was running, Defendant Murray placed himself directly in front of Mr. Rochester's vehicle.



Still image from Defendant Murray's body-worn camera as Officers Lutz and Galloway reach Mr. Rochester's vehicle.



Still image from Defendant Murray's body-worn camera immediately before he fired the first shot at Mr. Rochester.

41.     The Honda began moving at approximately 3:13:02 pm. At that time, Defendant Murray was still running in the middle of Chilton Street toward the front of the Honda. He was approximately 20 feet in front of the Honda when it began to move.

42.     Rather than moving toward the sidewalk and away from the moving vehicle, and despite having ample time to do so, Defendant Murray chose to remain in front of the Honda in the middle of the road.  Defendant Murray then fired his service weapon three times. Two shots struck the Honda's windshield; the other struck the hood. None hit Mr. Rochester.

43.     As the Honda moved forward and the front of the vehicle passed Defendant Murray without hitting him, Defendant Murray fired a fourth shot through the front passenger window.  At the time he decided to fire and fired, Defendant Murray was out of the path of the vehicle and neither he nor anyone else was in a position of risk.

44.     While Defendant Murray initially falsely claimed he had been hit and fell to the ground as Mr. Rochester's vehicle passed, Defendant Murray confirmed to two supervisors, separately, that he had not been.

45.    Defendant Murray's fourth shot struck Mr. Rochester in the right tricep.



Still image from Defendant Murray's body-worn camera immediately after he fired the fourth shot that killed Mr. Rochester, demonstrating that the car had passed by Defendant Murray without hitting him at the moment the lethal shot was fired.

46.    After Defendant Murray fired the four shots, Officer Mauri fired two shots from the sidewalk in front and to the left of Mr. Rochester's vehicle. Neither of these shots struck Mr. Rochester; one hit the hood of the Honda and the other likely struck the front bumper.

47.    After the shooting, the Honda stopped on Chilton Street, approximately five houses from where it had been parked.

48.    Mr. Rochester opened the driver's door and stepped to the street with his hands up, immediately saying, "I can't breathe," and got to his knees. Mr. Rochester had blood coming from his mouth.

49.    Officer Mauri put Mr. Rochester face-down on the street and began handcuffing him, yelling, "Put your fucking hands behind your back."

50.    Shortly thereafter, Defendant Murray called over the radio: "Signal 13. Start a medic." Other officers began arriving at the scene less than a minute later.

51.    The officers on scene provided medical care to Mr. Rochester until an ambulance arrived approximately nine minutes after the shooting.

52.    When the ambulance arrived, Mr. Rochester was handcuffed and lying on his left side on the ground. Mr. Rochester was conscious but having difficulty breathing. Mr. Rochester did not speak or show any motor response.

53.    The officers removed Mr. Rochester's handcuffs before Mr. Rochester was placed on a stretcher and into the ambulance.

54.    Mr. Rochester was transported to the John Hopkins Hospital, where he was pronounced dead at 3:41 p.m.

55.    Mr. Rochester's autopsy was conducted by Associate Pathologist Richard Morris, M.D., on February 20, 2022. Dr. Morris deemed Mr. Rochester's cause of death to be homicide, by "Gunshot Wounds (2) of Right Arm and Chest."

56.    Both wounds were caused by a single bullet, the fourth shot fired by Defendant Murray through the passenger window after Mr. Rochester's car passed him. The bullet traveled through Mr. Rochester's right tricep and then into his right chest.

57.    There was no risk of imminent death or severe bodily harm to Defendant Murray or anyone else at the time Defendant Murray discharged the shot that killed Mr. Rochester. There was no lawful basis for the shooting.

58.    BPD Firearms Regulations (Policy 409) and Use of Force (Policy 1115) both provide that officers may only use force that is reasonable, necessary, and proportional.

59.    The Use of Force Policy specifies that "[t]he use of Deadly Force/Lethal Force shall always be the last resort," and shall occur only when officers "reasonably believe such action is immediately necessary to protect a member or another person from an Imminent Threat of death or Serious Physical Injury." Before using deadly force, officers "shall consider environmental

considerations such as field of fire, backdrop, bystanders, potential for ricochet, possibility of over-penetration, and other risks to life."

60.    Specifically regarding fleeing individuals, officers may only use deadly force where there is probable cause to believe "the person has committed or is in the process of committing a felony involving the infliction or threatened infliction of Serious Physical Injury or death, and" escape "would pose an Imminent Threat of death or Serious Physical Injury"; "and [m]embers have identified themselves as law enforcement officers, have stated their intention to use Deadly Force/Lethal Force, and have given the person a reasonable opportunity to comply voluntarily, if time, safety, and the circumstances permit."

61.    The policy specifically states that officers shall not fire at moving vehicles, except to "counter an imminent threat of death or serious physical injury . . . by a person in the vehicle using means other than the vehicle," or to "counter a situation where the officer or another person is unavoidably in the path of the vehicle and cannot move to safety. Officers shall avoid positioning themselves in the path of a moving vehicle where they have no option but to use Deadly Force/Lethal Force."

62.    BPD's De-escalation Policy (Policy 1107) states that its goal is "to minimize the likelihood to use force," in order to increase safety for officers and the public. The policy describes de-escalation techniques such as communicating calmly, increasing time and distance, and avoiding physical confrontation. It also states: "Members shall perform their work in a manner that avoids unduly jeopardizing their own safety or the safety of others through poor tactical decisions including, but not limited to, immediately approaching a subject without proper evaluation of the situation, failing to leave sufficient space between the member and the subject, closing the reactionary gap, or escalating a situation."

63.     Despite these policies, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously placed himself in a situation where he had no option but to use lethal force, moving directly in front of Mr. Rochester's vehicle despite ample time and space to position himself away from the vehicle on the sidewalk or the opposite side of the street.

64.     Despite these policies, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously chose to use lethal force when Defendant Murray did not pose an imminent threat of death or serious physical injury to Defendant Murray, the other officers, or any other person.

65.     Despite these policies, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously chose to use lethal force in a residential neighborhood without consideration of the environmental considerations such as field of fire, backdrop, bystanders, potential for ricochet, possibility of over-penetration, and other risks to life.

66.     Despite these policies, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously chose to use lethal force instead of utilizing de-escalation techniques such as communicating calmly, increasing time and distance, and avoiding physical confrontation.

67.     Despite these policies, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously chose to unduly jeopardize his own safety and the safety of others including, but not limited to, Mr. Rochester, through poor tactical decision making including, but not limited to, immediately approaching Mr. Rochester without proper evaluation of the situation, failing to leave sufficient space between Defendant Murray and Mr. Rochester, closing the reactionary gap, and escalating the situation.

68.    Despite these policies, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously chose to use lethal force against Mr. Rochester when lethal force was not reasonable, necessary or proportional.

69.    Defendant Murray knew or should have known that his conduct unduly jeopardized his own safety without justification or purpose. On or about June 21, 2021, Defendant Murray completed a training titled "Firing at Moving Vehicles E-Learning."

70.    The training instructed Defendant Murray that "Firing from or at a moving vehicle is almost never a safe or effective means of stopping the threat posed by a suspect vehicle." The training also informed Defendant Murray that "You are not likely to stop a moving vehicle with your handgun round. The only thing you might do is create an out-of-control vehicle with an incapacitated driver."

71.    The training included a case study from another department, critiquing an officer for firing at a driver after the officer had stepped out of the way of the car. The training stated: "In this case study, the only apparent imminent deadly threat occurred when the officer walked into the path of the moving vehicle. However, the officer eliminated that threat by moving out of the vehicle's path before firing her weapon, thus any deadly force against the fleeing vehicle was inappropriate." Contrasting that officer's actions with the proper approach, the training instructed officers to "[i]ncrease distance, don't decrease it," and to "[p]lace yourself in a position of advantage, not in the way of a suspect's vehicle."

72.    Another case study in the training criticized an officer for firing towards a suspect vehicle when other officers were behind the target car, directing officers to consider their backdrop when firing, for "the safety of bystanders and other members."

73.     In 2020, Defendant Murray completed another computer-based training program regarding use of deadly force. This training program also instructed officers not to fire at a moving vehicle and that officers "shall not position themselves in the path of a moving vehicle where they have no option but to use Deadly/Lethal Force."

74.     The training instructed officers that they must constantly reassess whether the use of deadly force is appropriate, stating: "Members shall continuously assess each situation and change the member's response as the circumstances change. Members may be justified in using force in one instance, but not justified in using force an instant later. This duty to assess includes the continuous assessment of circumstances before and after the member discharges a firearm."

75.     The training also repeatedly instructed officers on de-escalation policies and methods, including multiple modules on creating space or placing barriers, slowing down the pace of an incident, utilizing tactical repositioning, or requesting additional resources.

76.     Despite this training, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously failed to assess the circumstances before he fired each of the four shots, including the shot that killed Mr. Rochester.

77.      Despite this training, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously failed to utilize de-escalation techniques that were available to him.

78.     Despite this training, Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously otherwise failed to act appropriately and proportionately under the circumstances outlined above.

79.     Any reasonable police officer would have adhered to the abovementioned policies if that officer had been adequately trained and/or supervised on those policies. Defendants State,

Baltimore, and BPD failed to adequately train and supervise Defendant Murray not to utilize unreasonable, unnecessary, disproportional, and unwarranted lethal force.

80.    Specifically, Defendants State, Baltimore, and BPD failed to ensure that officers, including Defendant Murray, knew, understood, and followed the BPD policies related to the use of firearms, the use of force, and de-escalation.

81.    Defendants State, Baltimore, and BPD had actual or constructive knowledge, prior to February 19, 2022, that adequate training of BPD officers on use of force, deadly/lethal force, and de-escalation was essential to avoid constitutional violations. Despite Defendants' actual or constructive knowledge of the obvious necessity of the aforesaid training, Defendants failed to adequately train the BPD officers, including Defendant Murray, and failed to do so with deliberate indifference to the right of the citizens, including Mr. Rochester.

82.    In the wake of the death of Freddie Carlos Gray, Jr., prior to the incident outlined in this Complaint, the United States Department of Justice ("DOJ") released a 163-page report[1] ("DOJ Report") outlining the BPD's pervasive pattern and practice of unlawful police conduct that violated the U.S. Constitution and federal and state laws.

83.    The DOJ report was specific, detailed, and thorough in describing the persistent and pervasive Constitutional violations committed by the BPD and its officers. To complete its investigation, the DOJ interviewed current and former City leaders, current and former commissioners, and current and former officers. The DOJ also participated in ride-alongs with BCPD officers and interviewed citizens of the City. The DOJ also reviewed hundreds of thousands of pages of documents, which included, *inter alia*, incident reports and data from stops and arrests.

---

[1] *Investigation of the Baltimore City Police Department*, U.S. Department of Justice, Civil Rights Division (August 10, 2016).

84.    The DOJ found that the pervasive and persistent pattern of Constitutional violations were not new to the BPD. To the contrary, these violations had been going on for decades, since at least the late 1990s when the BPD began the institutionalized and widespread practice of, *inter alia*, unconstitutionally using unreasonable and excessive force against city residents in violation of the Fourth Amendment.

85.    In addition to the BPD's response to the City's "zero tolerance" policy for enforcement of various laws, the DOJ report found that this pattern and practice of unconstitutional violations was driven and encouraged by systemic deficiencies in BPD's policies, training, supervision, and accountability structures, including but not limited to deficiencies in its oversight of its officers' uses of force.

86.    Further, the DOJ also reported that a significant number of incidents that it reviewed involved BPD officers using force against individuals who were fleeing from officers and who presented little or no threat of harm to the officer or to others. Many of the incidents involved officers who chased civilians on foot, often without suspicion that the civilian had committed any serious crime. Once engaged in the pursuit, officers then used force to end the pursuit, regardless of whether they had probable cause to conduct a stop or to make an arrest. Often, the force used to end the pursuit was disproportional to the suspected crime and the threat posed by the citizen, resulting in injury to that citizen.

87.    Eight cases reviewed by the DOJ during their investigation specifically involved BPD officers shooting at vehicles that were fleeing from officers – which the report notes "is unreasonable except in rare circumstances."

88.    Further, the DOJ noted that Baltimore City police officers frequently fire shots at vehicles fleeing away from them, when the vehicle no longer poses any threat to the officers

themselves, as occurred here, stating: "In some of these cases, although the factual descriptions were incomplete, it appeared officers may have fired shots at individuals in moving vehicles as the vehicle was fleeing away from them. At that point, the vehicle itself no longer posed a serious threat to the officers, and if it posed a threat to others, shooting at it likely increased the threat, rather than eliminating it."

89.     The DOJ on to conclude that firing at a moving vehicle is dangerous and ineffective: "Additionally, shooting at a moving vehicle is a highly dangerous tactic and an ineffective way to stop the vehicle. Using firearms against a moving vehicle often creates greater risks than it eliminates. If a driver is shot while a vehicle is in motion, the vehicle itself may become out of control and a danger, to officers and innocent bystanders in its path, rather than coming to a stop. Further, a moving vehicle is a difficult target to shoot with accuracy; shots fired may miss the intended target and hit bystanders or passengers in the vehicle. Thus, shooting at a moving vehicle should be permissible in only extreme circumstances."

90.     Moreover, the DOJ found that the BPD's training on the use of force and its Constitutional parameters was severely lacking, with it being sorely deficient at the initial levels through mandatory annual training. The BPD training failed to provide officers with the skills necessary to use force in a safe and Constitutional manner.

91.     The BPD also lacked clear and adequate use of force policies, and its officers lacked sufficient guidance to ensure that their uses of force were consistent with Constitutional guarantees.

92.     Internally, the BPD failed to collect and analyze data regarding its officers' uses of force, and it also failed to adequately supervise its officers. The DOJ found that the BPD failed to employ policies, training, supervision, data collection, analysis, and accountability systems to

ensure that officers who engaged in unconstitutional practices, such as the use of excessive force, were held accountable.

93.     Moreover, the BPD discouraged complaints from being filed, it misclassified complaints that were filed, and it conducted little to no investigation of those complaints, leading to a wholly inadequate system of investigating complaints and holding offending officers accountable. The DOJ also found that the BPD failed to use effective methods to investigate allegations of misconduct, supervise investigations of misconduct, and failed to sustain complaints and to apply discipline consistently.

94.     In many instances of complaints of excessive uses of force, supervising officers failed to thoroughly and objectively evaluate the offending officers' use of force. In use of force reports, inconsistencies and problematic behavior were not addressed and cover-ups routinely occurred.

95.     In sum, the BPD lacked meaningful reporting and investigation systems to deter and address officer misconduct. As a result, resistance to accountability persisted, and officers, like Defendant Murray, knew that their uses of police force would not be adequately scrutinized, thus empowering them to abuse their authority.

96.     The pattern and practice of Constitutional violations was, and continues to be, rooted in the lack of supervision, oversight, and the tacit condonation of the use of excessive force by the BPD and its supervising officers. The repeated and persistent Constitutional violations manifested in the widespread use of unreasonable force by BPD officers, like Defendant Murray, in violation of the Fourth Amendment.

97.     Ultimately, the DOJ concluded that the BPD needed significant reform to ensure that it complied with Constitutional guarantees, to which the BPD agreed.

98.     To that end, on April 7, 2017, the BPD filed a Consent Decree with the City and the DOJ to "ensure that the City and the Baltimore Police Department protect individuals' statutory and constitutional rights, treat individuals with dignity and respect, and promote public safety in a manner that is fiscally responsible and responsive to community priorities."

99.     As part of its agreement, the BPD agreed to provide guidance and training to its officers so that officers' stops, searches, uses of force, and arrests of citizens of the City complied with the U.S. Constitution and state and federal law.

100.     The BPD also agreed to require officers to use de-escalation techniques, whenever possible, before resorting to force and to reduce the need for force.

101.     The BPD also agreed to require its supervising officers to perform "increasingly rigorous reporting, investigation, and review" of their subordinate officers' uses of force.

102.     The BPD did not and has never fully abided by the terms of the Consent Decree. The rampant violations and cover-ups continued, with officers persistently and repeatedly violating the Constitutional rights of City citizens, with violations that were consistent with or identical to the violations that DOJ previously found that occurred over the course of several years.

103.     BPD officers continued to engage in conduct that included the use of unreasonable and excessive force, similar to the incident outlined in this Complaint.

104.     BPD officers' pattern and practice of unconstitutional conduct include numerous instances where police officers inappropriately utilized excessive force and other Constitutional and tort violations. These instances include, *but are not limited to*:

a.     In 1997, Baltimore City police officers arrested Jeffrey Alston for speeding. During the arrest, he was placed in a chokehold by the officers and thrown unsecured into a transport van. As a result of the excessive force and transport, Mr. Alston was severely

injured and left quadriplegic. A civil jury found in favor of Mr. Alston and Baltimore City later settled for $6 million.

   b.  On October 9, 2007, Bernard Gough was driving his vehicle when he slowed down for a speed bump. As he slowed down, he noticed in his rear-view mirror a man running towards his vehicle while aiming a gun directly at the vehicle. The man was a Baltimore City police officer. When the officer caught up to the vehicle, the officer fired a shot into the driver's side window without any warning or justification. The bullet went through Mr. Gough's neck, exiting out his mouth and lodging into his right arm. The shot knocked out all the teeth on the right side of Mr. Gough's mouth and rendered him unconscious, which caused the vehicle to crash. Mr. Gough required extensive medical treatment for nearly a year as a result of the serious injuries he sustained. The Baltimore Police Department settled Mr. Gough's claims for $1,000,000 in 2020. *Bernard Gough v. Jemell Rayam, et al.*, Case No. 1:20-cv-00542, D.Md.

   c.  In 2009, a plainclothes Baltimore City police officer beat up a Baltimore citizen, Jerriel Lyles, in an East Baltimore carryout restaurant.  Mr. Lyles subsequently settled his excessive

force case with the City for $200,000.

   d.  In 2011, the City of Baltimore paid a $100,000 settlement after Baltimore City police officers used excessive force against a 65-year-old church deacon who was rolling a tobacco cigarette outside his own home.

   e.  On April 10, 2012, a Baltimore City police officer responded to a call about a person walking on a sidewalk with an altered mental status. When the officer located David Yim, the officer pulled out his service weapon and fired four rounds at Mr. Yim

while still sitting in the driver seat of his marked police vehicle. Mr. Yim was struck twice in the abdomen and suffered permanent injuries and disfigurement. Mr. Yim's claims were settled in 2015 for $150,000. *Yim v. Murray*, Case No. 1:14-cv-2642 BPG, D.Md.

       f.      On January 28, 2013, Shaun Mouzon was driving in a safe and prudent manner when he stopped at a red traffic light. As the light turned green and he prepared to drive through the intersection, Mr. Mouzon was struck in the chest by multiple bullets fired by Baltimore City police officers. The officers had stopped their own vehicle in the middle of the street, surrounded Mr. Mouzon's vehicle on foot with guns drawn, and opened fire without cause or justification. Mr. Mouzon managed to navigate his vehicle safely through the intersection but crashed into a curb as a result of his inability to maintain control over the vehicle after being shot. Mr. Mouzon was severely injured as a result and had to undergo multiple surgeries following the shooting. Baltimore City settled Mr. Mouzon's claims for $400,000 in 2017. *Mouzon v. Meshaw, et al.*, Case No.: 1:16-cv-00156-RDB, D. Md.

       g.      On August 4, 2014, Brenda McDowell was walking down a public sidewalk when a Baltimore City police officer aggressively grabbed her arm from behind. Two officers searched Ms. McDowell for contraband before an officer began choking Ms. McDowell while yelling, "give me the gun, give me the gun," despite Ms. McDowell not having a gun on her person. Ms. McDowell escaped from the chokehold but the officer pushed her across a parked car, causing her to lose her balance and fall into the street. The officer then began to choke Ms. McDowell again, causing her to lose consciousness. The Baltimore Police Department settled Ms. McDowell's claims in 2019. *McDowell v. Grimes, et al.*, Case No.: 1:17-cv-03200-GLR, D. Md.

h.     On August 17, 2014, Eric Jones was walking down a public sidewalk when he was stopped by Baltimore City police officers and detained without articulable suspicion or other lawful authority. Mr. Jones attempted to leave and was tackled to the ground by the officers. Mr. Jones was forced face first into a hard cement curb, causing him to strike his head and suffer life threatening injuries including permanent brain damage. Baltimore City settled Mr. Jones' claims in 2020. *Jones v. Jordan, et al.*, Case No.: 1:16-cv-02662-GLR, D. Md.

i.     In May 2015, Baltimore City police officers pepper sprayed a man in the face from only a few feet away. Officers then grabbed the man by his hair and pulled him to the ground, before running to chase other residents in the vicinity with pepper spray. A jury later found the officers had used excessive force and awarded $75,000 to the man who had been pepper sprayed.

j.     On February 9, 2016, Kenneth Bumgardner was sitting in his vehicle when Baltimore City police officers struck his vehicle with their unmarked police car. Mr. Bumgardner fled from the vehicle and was struck from behind by one of the officers with a blunt object, causing Mr. Bumgardner to fall to the ground and lose consciousness. Mr. Bumgardner suffered a fractured mandible and sprained back as a result. The case was settled in 2020. *Bumgardner v. Taylor, et al.*, Case No.: 1:18-cv-1438-SAG, D. Md.

k.     On May 15, 2018, Sean Lewis, Jr., then a fifteen-year-old child, went to an elementary school to pick up his younger brother. When he arrived at the school, Mr. Lewis was asked to leave. When Mr. Lewis tried to explain that he was there to pick up his brother with his mother's permission, the school called the Baltimore Police Department. When the first officer arrived on scene with his taser drawn and ordered Mr. Lewis to leave, Mr.

Lewis complied. Even after Mr. Lewis left, the officer continued to engage Mr. Lewis while pointing his taser at him with no cause, until the officer decided to deploy his taser long after Mr. Lewis left the vicinity of the school with no cause or justification. The officer settled Mr. Lewis's claims in 2023. *Sean Lewis, Jr. v. Chris Florio*, Case No. 1:21-cv-01159, D.Md.

l.    On August 11, 2018, DaShawn McGrier was sitting on the steps of a storefront when a police officer drove slowly by in his patrol car. Due to prior unfriendly encounters with police, Mr. McGrier attempted to leave the area when the officer ordered him, without justification, to stop walking and provide identification. When Mr. McGrier asked why he was being stopped, the officer aggressively grabbed him and shoved him into the metal railings of the storefront. The officer then struck Mr. McGrier's face, head, chest, and ribs multiple times with his fist, continuing to brutally beat Mr. McGrier even after he fell to the ground. Mr. McGrier lost consciousness during the attack for at least one minute. Mr. McGrier suffered serious injuries including bruising on his spine and ribs, hematomas and abrasions. Baltimore City settled Mr. McGrier's claims for $575,000 in 2020. *Dashawn McGrier v. Arthur Williams, et al.*, Case No. 1:20-cv-01235, D.Md.

m.    On August 26, 2018, Henrietta Middleton, a sworn member of the Baltimore City Police Department herself, was exiting a club with friends when she was informed that she had forgotten personal belongings inside. Ms. Middleton returned to the entrance of the club where another Baltimore City police officer told her to back up. Before Ms. Middleton could comply, the officer, without provocation or justification, struck Ms. Middleton three times in her face, head, and ear. As Ms. Middleton attempted to retreat, the officer followed her, threw her to the ground, and grabbed her by her hair and clothing.

She sustained serious injuries including a concussion, post-traumatic headaches, and injuries to her neck and back. Ms. Middleton's claims went to trial in 2024 and the jury found in her favor in the amount of $5.2 million.

105.    The above list is not exhaustive, only representative, in part, of the settlements and verdicts by and against BPD, and it does not include matters that never led to litigation or internal investigations during the time before the incident in this case which were swept under the rug.

106.    Baltimore City police officers routinely use excessive force without justification or cause, including beating and shooting persons who clearly pose no threat to the officers or any other person.

107.    The duration and frequency of these unconstitutional practices were, and are, so widespread and so persistent within the BPD that they constitute a custom and use with the force of law. The BPD maintained a custom, policy, and practice of condoning officers conduct by knowingly, consciously, and repeatedly failing to correct a widespread pattern of unconstitutional conduct, which caused Mr. Rochester's Constitutional rights to be violated and ultimately resulted in Mr. Rochester's untimely death.

108.    Defendants State, Baltimore, and BPD each had a duty to ensure Defendant BPD's officers were trained to conduct their law enforcement activities within constitutional bounds and in adherence with all policies and regulations, and a duty to discipline and/or fire officers who failed to conduct their law enforcement activities adequately, constitutionally, and lawfully.

109.    Defendants State, Baltimore, and BPD each breached their duty to train Defendant Murray in the state and federal constitutional limits of his police authority, and all applicable policies and regulations, which led Defendant Murray to believe that he could take the inappropriate, unnecessary, disproportionate, unconstitutional, and illegal actions described

herein. Such a breach constitutes negligence, and/or gross negligence, and/or an intentional violation of Mr. Rochester's rights and person, and/or a malicious violation of Mr. Rochester's rights and person.

110.    Defendants State, Baltimore, and BPD each breached their duty to discipline officers who violate the constitutional rights of citizens and fail to comply with their policies and regulations. This breach constitutes negligence, and/or gross negligence, and/or an intentional violation of Mr. Rochester's rights and person, and/or a malicious violation of Mr. Rochester's rights and person.

111.    As a direct and proximate result of Defendants State, Baltimore, and BPD's negligence, and/or gross negligence, and/or intentional conduct, and/or malicious conduct, Mr. Rochester was unjustly, unconstitutionally, unnecessarily, and disproportionately killed by Defendant Murray and subjected to unconstitutionally excessive lethal force.

112.    As a direct and proximate result of Defendant Murray's negligence, and/or gross negligence, and/or intentional conduct, and/or malicious conduct, Mr. Rochester was unjustly, unconstitutionally, unnecessarily, and disproportionately killed by Defendant Murray and subjected to unconstitutionally excessive lethal force.

113.    Mr. Rochester's death was a direct and proximate result of negligent, grossly negligent, reckless, deliberately indifferent, and unconstitutional conduct of Defendants and their agents. Mr. Rochester did not cause or contribute to this outcome.

114.    All allegations herein, however worded, are pleaded alternatively as acts of negligence, gross negligence, intent, and/or malice, as determined at trial by the jury in this matter.

g.      Ensuring that no officer positions themselves in the path of a moving vehicle where they have no option but to use lethal force;

h.      Adequately and competently minimizing the likelihood of using any level of force, and especially lethal force, by utilizing de-escalation techniques including, but not limited to, communicating calmly, increasing time and distance, and avoiding physical confrontation;

i.      Ensuring that officers perform their work in a manner that avoids unduly jeopardizing their own safety through poor tactical decisions including, but not limited to, approaching a subject without proper evaluation of the situation, failing to leave sufficient space between the officer and the subject, closing the reactionary gap, or escalating a situation; and

j.      Adequately, competently, and continuously assessing each situation and changing the officer's response as the circumstances change, as even if force is justified in one instant, force may not be justified an instant later.

118.    Defendants failed to comply with these duties, as described herein, which wrongfully caused the death of Mr. Rochester.

119.    These failures included, but are not limited to:

a.      Defendant Murray's failure to comply with Defendants' policies and regulations and ensure that he carried out his job duties in a legal and constitutional manner;

b.      Defendant Murray's utilization of unreasonable, unnecessary, disproportionate, and unjustified lethal force;

c.      Defendant Murray's utilization of lethal force when he had no justifiable reason to believe that lethal force was necessary to protect himself or any other person

against an immediate and imminent threat of death or serious physical injury, as Mr. Rochester posed no threat to Defendant Murray or any other person at the time Defendant Murray fired the fourth, fatal shot;

d.    Defendant Murray's failure to adequately and competently take into consideration all environmental factors before utilizing lethal force, which resulted in Defendant Murray inappropriately, unnecessarily, disproportionately and unjustifiably utilizing lethal force in a residential neighborhood;

e.    Defendant Murray's unjustifiable utilization of lethal force against a fleeing individual, when he had no reason to believe that Mr. Rochester's escape would pose an imminent threat of death or serious physical injury and he knew that firing on a moving vehicle is almost never a safe or effective means of stopping a moving vehicle and could create an out-of-control vehicle with an incapacitated driver;

f.    Defendant Murray's unjustifiable utilization of lethal force against a person in a moving vehicle when he had no reason to believe that Mr. Rochester posed any threat to any individual by means other than the vehicle and no individual—including Defendant Murray—was unavoidably in the path of the vehicle, as Defendant Murray had every opportunity to move himself to safety;

g.    Defendant Murray's unjustifiable decision to place himself directly in the path of a moving vehicle, forcing a situation where he could claim he had no option but to use lethal force, when Defendant Murray had every opportunity to move himself to safety and de-escalate the situation;

h.    Defendant Murray's failure to adequately and competently minimize the likelihood of using lethal force by utilizing de-escalation techniques, as Defendant Murray

failed to utilize any de-escalation technique at any point during the encounter despite numerous opportunities to do so and numerous de-escalation techniques available to him;

i.      Defendant Murray's failure to perform his work in a manner that avoids unduly jeopardizing his own safety through poor tactical decisions including, but not limited to, approaching Mr. Rochester without proper evaluation of the situation, failing to leave sufficient space between himself and Mr. Rochester, purposefully placing himself directly in the path of Mr. Rochester's vehicle, despite ample other safe locations to position himself, closing the reactionary gap, and otherwise escalating the situation; and

j.      Defendant Murray's failure to adequately, competently, and continuously assess the situation as it developed, including re-evaluating the necessity and justifiability of lethal force between his third shot and the fourth lethal shot, after Mr. Rochester's vehicle had passed Defendant Murray.

120.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

121.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

## COUNT II
**Survivorship Claim**
**(Against All Defendants)**

122.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

123.    Plaintiff is the Personal Representative of the Estate of Donnell R. Rochester.

124.    Defendants owed a duty to act reasonably towards Mr. Rochester, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

125.    Defendants' duties to Mr. Rochester included, but are not limited to:

a.    Complying with Defendants' policies and regulations to ensure that law enforcement officers carry out their job duties in a legal and constitutional manner;

b.    Ensuring that the only force used in any encounter with a civilian is reasonable, necessary, and proportional;

c.    Utilizing lethal force only as a last resort and only when an officer reasonably believes such action is immediately necessary to protect themselves or another person from an imminent threat of death or serious physical injury;

d.    Adequately and competently take into consideration all environmental factors before utilizing lethal force, including, but not limited to, field of fire, backdrop, bystanders, potential for ricochet, possibility of over-penetration, and other risks to life;

e.    Utilizing lethal force against a fleeing individual only when the person's escape would pose an imminent threat of death or serious physical injury;

f.    Ensuring that no officer fires at a moving vehicle, except to counter an imminent threat of death or serious physical injury by the driver using means other than

c.      Defendant Murray's utilization of lethal force when he had no justifiable reason to believe that lethal force was necessary to protect himself or any other person against an immediate and imminent threat of death or serious physical injury, as Mr. Rochester posed no threat to Defendant Murray or any other person at the time Defendant Murray fired the fourth, fatal shot;

d.      Defendant Murray's failure to adequately and competently take into consideration all environmental factors before utilizing lethal force, which resulted in Defendant Murray inappropriately, unnecessarily, disproportionately and unjustifiably utilizing lethal force in a residential neighborhood;

e.      Defendant Murray's unjustifiable utilization of lethal force against a fleeing individual, when he had no reason to believe that Mr. Rochester's escape would pose an imminent threat of death or serious physical injury and he knew that firing on a moving vehicle is almost never a safe or effective means of stopping a moving vehicle and could create an out-of-control vehicle with an incapacitated driver;

f.      Defendant Murray's unjustifiable utilization of lethal force against a person in a moving vehicle when he had no reason to believe that Mr. Rochester posed any threat to any individual by means other than the vehicle and no individual—including Defendant Murray—was unavoidably in the path of the vehicle, as Defendant Murray had every opportunity to move himself to safety;

g.      Defendant Murray's unjustifiable decision to place himself directly in the path of a moving vehicle, forcing a situation where he could claim he had no option but to use lethal force, when Defendant Murray had every opportunity to move himself to safety and de-escalate the situation;

32

h.    Defendant Murray's failure to adequately and competently minimize the likelihood of using lethal force by utilizing de-escalation techniques, as Defendant Murray failed to utilize any de-escalation technique at any point during the encounter despite numerous opportunities to do so and numerous de-escalation techniques available to him;

i.    Defendant Murray's failure to perform his work in a manner that avoids unduly jeopardizing his own safety through poor tactical decisions including, but not limited to, approaching Mr. Rochester without proper evaluation of the situation, failing to leave sufficient space between himself and Mr. Rochester, purposefully placing himself directly in the path of Mr. Rochester's vehicle, despite ample other safe locations to position himself, closing the reactionary gap, and otherwise escalating the situation; and

j.    Defendant Murray's failure to adequately, competently, and continuously assess the situation as it developed, including re-evaluating the necessity and justifiability of lethal force between his third shot and the fourth lethal shot, after Mr. Rochester's vehicle had passed Defendant Murray.

128.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

129.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

**COUNT III**
**Civil Rights Act, 42 U.S.C. § 1983**
**Excessive Force**
**(Against Defendant Murray)**

130.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

131.    The Fourth Amendment of the Constitution of the United States protects citizens against unreasonable search or seizure, including protection against excessive force. These constitutional protections are applied to the states and their political subdivisions under the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

132.    At all relevant times, Defendant Murray acted under color of State law and under his authority as a Baltimore City police officer.

133.    Defendant Murray deprived Mr. Rochester of his rights under the Fourth Amendment of the Constitution of the United States by using excessive lethal force against Mr. Rochester.

134.    At the time Defendant Murray fired the lethal fourth shot, Mr. Rochester was not a threat to the safety of Defendant Murray, the other officers on scene, or any other person.

135.    Despite the fact that Mr. Rochester was not a threat to any person's safety, Defendant Murray fired his weapon through the passenger-side window and killed Mr. Rochester.

136.    Defendant Murray also deprived Mr. Rochester of his Constitutional rights by the actions otherwise detailed herein, including, but not limited to:

a.    Defendant Murray's failure to comply with Defendants' policies and regulations and ensure that he carried out his job duties in a legal and constitutional manner;

b.    Defendant Murray's utilization of unreasonable, unnecessary, disproportionate, and unjustified lethal force;

c.    Defendant Murray's utilization of lethal force when he had no justifiable reason to believe that lethal force was necessary to protect himself or any other person against an immediate and imminent threat of death or serious physical injury, as Mr. Rochester posed no threat to Defendant Murray or any other person at the time Defendant Murray fired the fourth, fatal shot;

d.    Defendant Murray's failure to adequately and competently take into consideration all environmental factors before utilizing lethal force, which resulted in Defendant Murray inappropriately, unnecessarily, disproportionately and unjustifiably utilizing lethal force in a residential neighborhood;

e.    Defendant Murray's unjustifiable utilization of lethal force against a fleeing individual, when he had no reason to believe that Mr. Rochester's escape would pose an imminent threat of death or serious physical injury and he knew that firing on a moving vehicle is almost never a safe or effective means of stopping a moving vehicle and could create an out-of-control vehicle with an incapacitated driver;

f.    Defendant Murray's unjustifiable utilization of lethal force against a person in a moving vehicle when he had no reason to believe that Mr. Rochester posed any threat to any individual by means other than the vehicle and no individual—including Defendant Murray—was unavoidably in the path of the vehicle, as Defendant Murray had every opportunity to move himself to safety;

g.       Defendant Murray's unjustifiable decision to place himself directly in the path of a moving vehicle, forcing a situation where he could claim he had no option but to use lethal force, when Defendant Murray had every opportunity to move himself to safety and de-escalate the situation;

h.       Defendant Murray's failure to adequately and competently minimize the likelihood of using lethal force by utilizing de-escalation techniques, as Defendant Murray failed to utilize any de-escalation technique at any point during the encounter despite numerous opportunities to do so and numerous de-escalation techniques available to him;

i.        Defendant Murray's failure to perform his work in a manner that avoids unduly jeopardizing his own safety through poor tactical decisions including, but not limited to, approaching Mr. Rochester without proper evaluation of the situation, failing to leave sufficient space between himself and Mr. Rochester, purposefully placing himself directly in the path of Mr. Rochester's vehicle, despite ample other safe locations to position himself, closing the reactionary gap, and otherwise escalating the situation; and

j.        Defendant Murray's failure to adequately, competently, and continuously assess the situation as it developed, including re-evaluating the necessity and justifiability of lethal force between his third shot and the fourth lethal shot, after Mr. Rochester's vehicle had passed Defendant Murray.

137.    Mr. Rochester had the right to be free from excessive force by Defendants.

138.    Mr. Rochester had a protected property and liberty interest in his freedom, his ability to exercise his free will and domain over his person, his ability to be free from unlawful and unwelcome abuse and attack by the police and his ability to practice his chosen profession and earn a living thereby.

139.    Mr. Rochester was deprived of numerous protected property and liberty interests by Defendants.

140.    Mr. Rochester was afforded less process than was due under law by Defendants depriving him of the rights in question.

141.    By the actions detailed above, Defendants deprived Mr. Rochester of his constitutional rights including, but not limited to, freedom from abuse of power by those acting under color of state law and authority.

142.    Defendant Murray acted unreasonably in his conduct towards Mr. Rochester, subjecting Mr. Rochester to summary punishment, excessive lethal force, and violating his due process rights.

143.    Defendant Murray's conduct constituted an utter disregard for the established and manifest Fourth Amendment rights of Mr. Rochester, to the point that Mr. Rochester was treated as if those rights did not exist, even though Defendant Murray knew, or should have known, of the existence of those rights. In the alternative, Defendant Murray's conduct constituted a knowing and intentional violation of Mr. Rochester's Fourth Amendment rights.

144.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

145.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss,

37

mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

**COUNT IV**
**Maryland Declaration of Rights, Articles 24 and 26**
**Excessive Force**
**(Against All Defendants)**

146.     Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

147.     Articles 24 and 26 of the Maryland Declaration of Rights protect citizens against unreasonable search or seizure, including protection against excessive force.

148.     At all relevant times, Defendant Murray acted under color of State law and under his authority as a Baltimore City police officer.

149.     Defendant Murray deprived Mr. Rochester of his rights under Articles 24 and 26 of the Maryland Declaration of Rights by using excessive lethal force against Mr. Rochester.

150.     At the time Defendant Murray fired the lethal fourth shot, Mr. Rochester was not a threat to the safety of Defendant Murray, the other officers on scene, or any other person.

151.     Despite the fact that Mr. Rochester was not a threat to any person's safety, Defendant Murray fired his weapon through the passenger-side window and killed Mr. Rochester.

152.     Defendant Murray also deprived Mr. Rochester of his State Constitutional rights by the actions otherwise detailed herein, including, but not limited to:

a.     Defendant Murray's failure to comply with Defendants' policies and regulations and ensure that he carried out his job duties in a legal and constitutional manner;

38

b.    Defendant    Murray's    utilization    of    unreasonable,    unnecessary, disproportionate, and unjustified lethal force;

c.    Defendant Murray's utilization of lethal force when he had no justifiable reason to believe that lethal force was necessary to protect himself or any other person against an immediate and imminent threat of death or serious physical injury, as Mr. Rochester posed no threat to Defendant Murray or any other person at the time Defendant Murray fired the fourth, fatal shot;

d.    Defendant Murray's failure to adequately and competently take into consideration all environmental factors before utilizing lethal force, which resulted in Defendant Murray inappropriately, unnecessarily, disproportionately and unjustifiably utilizing lethal force in a residential neighborhood;

e.    Defendant Murray's unjustifiable utilization of lethal force against a fleeing individual, when he had no reason to believe that Mr. Rochester's escape would pose an imminent threat of death or serious physical injury and he knew that firing on a moving vehicle is almost never a safe or effective means of stopping a moving vehicle and could create an out-of-control vehicle with an incapacitated driver;

f.    Defendant Murray's unjustifiable utilization of lethal force against a person in a moving vehicle when he had no reason to believe that Mr. Rochester posed any threat to any individual by means other than the vehicle and no individual—including Defendant Murray—was unavoidably in the path of the vehicle, as Defendant Murray had every opportunity to move himself to safety;

g.    Defendant Murray's unjustifiable decision to place himself directly in the path of a moving vehicle, forcing a situation where he could claim he had no option but to

use lethal force, when Defendant Murray had every opportunity to move himself to safety and de-escalate the situation;

h.     Defendant Murray's failure to adequately and competently minimize the likelihood of using lethal force by utilizing de-escalation techniques, as Defendant Murray failed to utilize any de-escalation technique at any point during the encounter despite numerous opportunities to do so and numerous de-escalation techniques available to him;

i.     Defendant Murray's failure to perform his work in a manner that avoids unduly jeopardizing his own safety through poor tactical decisions including, but not limited to, approaching Mr. Rochester without proper evaluation of the situation, failing to leave sufficient space between himself and Mr. Rochester, purposefully placing himself directly in the path of Mr. Rochester's vehicle, despite ample other safe locations to position himself, closing the reactionary gap, and otherwise escalating the situation; and

j.     Defendant Murray's failure to adequately, competently, and continuously assess the situation as it developed, including re-evaluating the necessity and justifiability of lethal force between his third shot and the fourth lethal shot, after Mr. Rochester's vehicle had passed Defendant Murray.

153.   Mr. Rochester had the right to be free from excessive force by Defendants.

154.   Mr. Rochester had a protected property and liberty interest in his freedom, his ability to exercise his free will and domain over his person, his ability to be free from unlawful and unwelcome abuse and attack by the police and his ability to practice his chosen profession and earn a living thereby.

155.   Mr. Rochester was deprived of numerous protected property and liberty interests by Defendants.

40

156.    Mr. Rochester was afforded less process than was due under law by Defendants depriving him of the rights in question.

157.    By the actions detailed above, Defendants deprived Mr. Rochester of his constitutional rights including, but not limited to, freedom from abuse of power by those acting under color of state law and authority.

158.    Defendant Murray acted unreasonably in his conduct towards Mr. Rochester, subjecting Mr. Rochester to summary punishment, excessive lethal force, and violating his due process rights.

159.    Defendant Murray was acting under color of State law, in his capacity as a Baltimore City police officer. As such, Defendants State, Baltimore, and BPD are liable for Defendant Murray's conduct.

160.    In the alternative, Defendant Durant's unconstitutional deprivation of Mr. Rochester's life and liberty constitutes gross negligence, and Defendant Murray is personally liable for his conduct.

161.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

162.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

## COUNT V
### Battery
### (Against All Defendants)

163.   Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

164.   At all relevant times, Defendant Murray acted under color of State law and under his authority as a Baltimore City police officer.

165.   Defendant Murray battered Mr. Rochester when he unlawfully, unreasonably, and unnecessarily shot and killed Mr. Rochester. Defendant Murray intended to unlawfully invade his physical well-being through harmful or offensive contact.

166.   Defendant Murray's intentional actions caused Mr. Rochester to be put in reasonable apprehension of immediate touching to which he did not consent.

167.   Defendant Murray's actions raised in Mr. Rochester's mind an apprehension of imminent bodily harm when he unlawfully used excessive force against him.

168.   Mr. Rochester was threatened by Defendant Murray who had possessed the apparent present ability to carry out that threat.

169.   Defendant Murray intentionally touched Mr. Rochester in a harmful or offensive manner when he unlawfully used excessive force and killed Mr. Rochester. Mr. Rochester did not give Defendant Murray permission to touch him in that or any other manner.

170.    Defendant Murray's conduct was without legal justification and was intentional. Defendant Murray acted as Defendants State, Baltimore, and BPD's agent, servant, and/or employee when he shot and killed Mr. Rochester.

171.    Defendant Murray's conduct was committed within the scope of his employment, thus Defendants State, Baltimore, and BPD are vicariously liable for his tortious actions.

172.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

173.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

**COUNT VI**
**Negligence**
**(Against All Defendants)**

174.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

175.    Defendants owed a duty to act reasonably towards Mr. Rochester, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

176.    Defendants' duties to Mr. Rochester included, but are not limited to:

a.      Complying with Defendants' policies and regulations to ensure that law enforcement officers carry out their job duties in a legal and constitutional manner;

b.      Ensuring that the only force used in any encounter with a civilian is reasonable, necessary, and proportional;

c.      Utilizing lethal force only as a last resort and only when an officer reasonably believes such action is immediately necessary to protect themselves or another person from an imminent threat of death or serious physical injury;

d.      Adequately and competently take into consideration all environmental factors before utilizing lethal force, including, but not limited to, field of fire, backdrop, bystanders, potential for ricochet, possibility of over-penetration, and other risks to life;

e.      Utilizing lethal force against a fleeing individual only when the person's escape would pose an imminent threat of death or serious physical injury;

f.      Ensuring that no officer fires at a moving vehicle, except to counter an imminent threat of death or serious physical injury by the driver using means other than the vehicle or to counter a situation where a person is unavoidably in the path of the vehicle and cannot move to safety;

g.      Ensuring that no officer positions themselves in the path of a moving vehicle where they have no option but to use lethal force;

h.      Adequately and competently minimizing the likelihood of using any level of force, and especially lethal force, by utilizing de-escalation techniques including, but not limited to, communicating calmly, increasing time and distance, and avoiding physical confrontation;

i.    Ensuring that officers perform their work in a manner that avoids unduly jeopardizing their own safety through poor tactical decisions including, but not limited to, approaching a subject without proper evaluation of the situation, failing to leave sufficient space between the officer and the subject, closing the reactionary gap, or escalating a situation; and

j.    Adequately, competently, and continuously assessing each situation and changing the officer's response as the circumstances change, as even if force is justified in one instant, force may not be justified an instant later.

177.   Defendants failed to comply with these duties, as described herein, which wrongfully caused the death of Mr. Rochester.

178.   These failures included, but are not limited to:

a.    Defendant Murray's failure to comply with Defendants' policies and regulations and ensure that he carried out his job duties in a legal and constitutional manner;

b.    Defendant Murray's utilization of unreasonable, unnecessary, disproportionate, and unjustified lethal force;

c.    Defendant Murray's utilization of lethal force when he had no justifiable reason to believe that lethal force was necessary to protect himself or any other person against an immediate and imminent threat of death or serious physical injury, as Mr. Rochester posed no threat to Defendant Murray or any other person at the time Defendant Murray fired the fourth, fatal shot;

d.    Defendant Murray's failure to adequately and competently take into consideration all environmental factors before utilizing lethal force, which resulted in

45

Defendant Murray inappropriately, unnecessarily, disproportionately and unjustifiably utilizing lethal force in a residential neighborhood;

e.      Defendant Murray's unjustifiable utilization of lethal force against a fleeing individual, when he had no reason to believe that Mr. Rochester's escape would pose an imminent threat of death or serious physical injury and he knew that firing on a moving vehicle is almost never a safe or effective means of stopping a moving vehicle and could create an out-of-control vehicle with an incapacitated driver;

f.      Defendant Murray's unjustifiable utilization of lethal force against a person in a moving vehicle when he had no reason to believe that Mr. Rochester posed any threat to any individual by means other than the vehicle and no individual—including Defendant Murray—was unavoidably in the path of the vehicle, as Defendant Murray had every opportunity to move himself to safety;

g.      Defendant Murray's unjustifiable decision to place himself directly in the path of a moving vehicle, forcing a situation where he could claim he had no option but to use lethal force, when Defendant Murray had every opportunity to move himself to safety and de-escalate the situation;

h.      Defendant Murray's failure to adequately and competently minimize the likelihood of using lethal force by utilizing de-escalation techniques, as Defendant Murray failed to utilize any de-escalation technique at any point during the encounter despite numerous opportunities to do so and numerous de-escalation techniques available to him;

i.      Defendant Murray's failure to perform his work in a manner that avoids unduly jeopardizing his own safety through poor tactical decisions including, but not limited to, approaching Mr. Rochester without proper evaluation of the situation, failing to

leave sufficient space between himself and Mr. Rochester, purposefully placing himself directly in the path of Mr. Rochester's vehicle, despite ample other safe locations to position himself, closing the reactionary gap, and otherwise escalating the situation; and

j.      Defendant Murray's failure to adequately, competently, and continuously assess the situation as it developed, including re-evaluating the necessity and justifiability of lethal force between his third shot and the fourth lethal shot, after Mr. Rochester's vehicle had passed Defendant Murray.

179.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

180.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

<u>**COUNT VII**</u>
**Gross Negligence**
**(Against Defendant Murray)**

181.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

182.    Defendant Murray owed a duty to act reasonably towards Mr. Rochester, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

183.    Defendant Murray's duties to Mr. Rochester included, but are not limited to:

a.    Complying with Defendants' policies and regulations to ensure that law enforcement officers carry out their job duties in a legal and constitutional manner;

b.    Ensuring that the only force used in any encounter with a civilian is reasonable, necessary, and proportional;

c.    Utilizing lethal force only as a last resort and only when an officer reasonably believes such action is immediately necessary to protect themselves or another person from an imminent threat of death or serious physical injury;

d.    Adequately and competently take into consideration all environmental factors before utilizing lethal force, including, but not limited to, field of fire, backdrop, bystanders, potential for ricochet, possibility of over-penetration, and other risks to life;

e.    Utilizing lethal force against a fleeing individual only when the person's escape would pose an imminent threat of death or serious physical injury;

f.    Ensuring that no officer fires at a moving vehicle, except to counter an imminent threat of death or serious physical injury by the driver using means other than the vehicle or to counter a situation where a person is unavoidably in the path of the vehicle and cannot move to safety;

g.    Ensuring that no officer positions themselves in the path of a moving vehicle where they have no option but to use lethal force;

      h.     Adequately and competently minimizing the likelihood of using any level of force, and especially lethal force, by utilizing de-escalation techniques including, but not limited to, communicating calmly, increasing time and distance, and avoiding physical confrontation;

      i.     Ensuring that officers perform their work in a manner that avoids unduly jeopardizing their own safety through poor tactical decisions including, but not limited to, approaching a subject without proper evaluation of the situation, failing to leave sufficient space between the officer and the subject, closing the reactionary gap, or escalating a situation; and

      j.     Adequately, competently, and continuously assessing each situation and changing the officer's response as the circumstances change, as even if force is justified in one instant, force may not be justified an instant later.

184.    Defendant Murray acted with gross negligence when he failed to comply with these duties, as described herein, which wrongfully caused the death of Mr. Rochester.

185.    These failures included, but are not limited to:

      a.     Defendant Murray's failure to comply with Defendants' policies and regulations and ensure that he carried out his job duties in a legal and constitutional manner;

      b.     Defendant Murray's utilization of unreasonable, unnecessary, disproportionate, and unjustified lethal force;

      c.     Defendant Murray's utilization of lethal force when he had no justifiable reason to believe that lethal force was necessary to protect himself or any other person against an immediate and imminent threat of death or serious physical injury, as Mr.

Rochester posed no threat to Defendant Murray or any other person at the time Defendant Murray fired the fourth, fatal shot;

d.      Defendant Murray's failure to adequately and competently take into consideration all environmental factors before utilizing lethal force, which resulted in Defendant Murray inappropriately, unnecessarily, disproportionately and unjustifiably utilizing lethal force in a residential neighborhood;

e.      Defendant Murray's unjustifiable utilization of lethal force against a fleeing individual, when he had no reason to believe that Mr. Rochester's escape would pose an imminent threat of death or serious physical injury and he knew that firing on a moving vehicle is almost never a safe or effective means of stopping a moving vehicle and could create an out-of-control vehicle with an incapacitated driver;

f.      Defendant Murray's unjustifiable utilization of lethal force against a person in a moving vehicle when he had no reason to believe that Mr. Rochester posed any threat to any individual by means other than the vehicle and no individual—including Defendant Murray—was unavoidably in the path of the vehicle, as Defendant Murray had every opportunity to move himself to safety;

g.      Defendant Murray's unjustifiable decision to place himself directly in the path of a moving vehicle, forcing a situation where he could claim he had no option but to use lethal force, when Defendant Murray had every opportunity to move himself to safety and de-escalate the situation;

h.      Defendant Murray's failure to adequately and competently minimize the likelihood of using lethal force by utilizing de-escalation techniques, as Defendant Murray

failed to utilize any de-escalation technique at any point during the encounter despite numerous opportunities to do so and numerous de-escalation techniques available to him;

i.      Defendant Murray's failure to perform his work in a manner that avoids unduly jeopardizing his own safety through poor tactical decisions including, but not limited to, approaching Mr. Rochester without proper evaluation of the situation, failing to leave sufficient space between himself and Mr. Rochester, purposefully placing himself directly in the path of Mr. Rochester's vehicle, despite ample other safe locations to position himself, closing the reactionary gap, and otherwise escalating the situation; and

j.      Defendant Murray's failure to adequately, competently, and continuously assess the situation as it developed, including re-evaluating the necessity and justifiability of lethal force between his third shot and the fourth lethal shot, after Mr. Rochester's vehicle had passed Defendant Murray.

186.    By knowingly, intentionally, and/or with reckless disregard committing such failures and breach of duties owed to Mr. Rochester, Defendant Murray was acting with wanton and willful disregard of Mr. Parker's rights as if such rights did not exist.

187.    Defendant Murray's conduct, actions, and inactions constituted an intentional failure to perform their duty in reckless disregard of the consequences affecting Mr. Rochester's life or property. Defendant Murray exhibited a thoughtless disregard of the consequences of his actions without any effort to avoid such consequences.

188.    In the alternative, Defendant Murray was so utterly indifferent to Mr. Rochester's rights that he acted as if such rights did not exist, resulting in Mr. Rochester's untimely death.

189.    As a direct and proximate result of Defendant Murray's failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action

and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

190.    As a direct and proximate result of Defendant Murray's failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

## COUNT VIII
### Negligent Training, Supervision, Hiring, and Retention
### (Against Defendants State, Baltimore, and BPD)

191.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

192.    Defendants State, Baltimore, and BPD each had a duty to ensure Defendant BPD's officers were trained to conduct their law enforcement activities within constitutional bounds and in adherence with all policies and regulations, and a duty to discipline and/or fire officers who failed to conduct their law enforcement activities adequately, constitutionally, and lawfully.

193.    Defendants State, Baltimore, and BPD each breached their duty to train Defendant Murray in the state and federal constitutional limits of his police authority, and all applicable policies and regulations, which led Defendant Murray to believe that he could take the inappropriate, unnecessary, disproportionate, unconstitutional, and illegal actions described herein. Such a breach constitutes negligence, and/or gross negligence, and/or an intentional

violation of Mr. Rochester's rights and person, and/or a malicious violation of Mr. Rochester's rights and person.

194.    Defendants State, Baltimore, and BPD each breached their duty to discipline officers who violate the constitutional rights of citizens and fail to comply with their policies and regulations. This breach constitutes negligence, and/or gross negligence, and/or an intentional violation of Mr. Rochester's rights and person, and/or a malicious violation of Mr. Rochester's rights and person.

195.    Defendants State, Baltimore, and BPD each had a duty to use reasonable care to select employees who are competent and fit to perform the duties of a police officer.

196.    Defendant Murray was an employee of Defendants State, Baltimore, and BPD at all times relevant hereto.

197.    Upon information and belief, as outlined herein, Baltimore City police officers, including, but not limited to, Defendant Murray, have previously committed violations such as those at issue here.

198.    Upon information and belief, as outlined herein, Baltimore City police officers, including, but not limited to, Defendant Murray, have not been properly trained to perform their job duties. What training that has been provided is woefully insufficient in light of the decades-long culture of misconduct in the Department.

199.    Upon information and belief, as outlined herein, Baltimore City police officers, including, but not limited to, Defendant Murray, have been retained in, or promoted to, positions that these individuals are not trained for and cannot competently perform.

200.    Defendants State, Baltimore, and BPD had constructive and/or actual knowledge of their employees' previous violations, lack of training, lack of preparedness for their positions, and failure to competently perform their job duties.

201.    Defendants State, Baltimore, and BPD's constructive and/or actual knowledge of their employees' previous violations, lack of training, lack of preparedness for their positions, and failure to competently perform their job duties gives rise to a duty to duty to supervise, discipline, or terminate the employment of its employees and to enact policies and procedures to ensure that its employees competently perform their duties.

202.    Despite having the duty and authority to discipline, supervise, and terminate the employment of its employees, and to enact policies and procedures to ensure that their employees adequately and competently perform their job duties, Defendants State, Baltimore, and BPD failed to do so.

203.    As a direct and proximate result of Defendants State, Baltimore, and BPD's failures to supervise, hire, retain, and train, and failure to put into place sufficient policies and procedures to ensure that their employees performed their job duties competently, Defendants State, Baltimore, and BPD's employees were put in a position to commit the wrongs in this case.

204.    Defendants State, Baltimore, and BPD knew or should have known that their supervision and training was inadequate to ensure that their employees do not engage in unlawful, unconstitutional, or tortious conduct and that its policies and procedures were deficient to ensure that failures such as those that occurred in this case do not occur.

205.    This negligent training, supervision, hiring, and training has led to a pattern or practice of tortious conduct on the part of Defendants State, Baltimore, and BPD and their employees.

206.     As a direct and proximate result of Defendants State, Baltimore, and BPD's negligence, and/or gross negligence, and/or intentional conduct, and/or malicious conduct, Mr. Rochester was unjustly, unconstitutionally, unnecessarily, and disproportionately killed by Defendant Murray and subjected to unconstitutionally excessive lethal force.

207.     As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

208.     As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

**COUNT IX**
**Civil Rights Act, 42 U.S.C. § 1983**
***Monell* Claim**
**(Against Defendants Baltimore and BPD)**

209.     Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

210.     At all relevant times herein, Defendants Baltimore and BPD were "persons" within the meaning of 42 U.S.C. § 1983 and their conduct was and is subject to 42 U.S.C. § 1983.

211.    At all relevant times herein, Mr. Rochester had rights under the Fourth and Fourteenth Amendments not to have his person or property unlawfully seized in an unreasonable manner, not to be deprived of his liberty without due process of law, not to be summarily punished, and not to be subjected to the use of unreasonable and excessive force.

212.    It is established now and was clearly established at the time of Defendant Murray's actions that the conduct, pattern, and practices of Defendants Baltimore and BPD violated the Fourth and Fourteenth Amendment to the U.S. Constitution.

213.    Defendant Murray, while acting under color of law, deprived Mr. Rochester of his clearly established and well-settled rights under the Fourth and Fourteenth Amendment of the U.S. Constitution not to have his person or property unlawfully seized, not to be deprived of liberty without due process of law, not to be summarily punished, and not to be subjected to the use of unreasonable and excessive force.

214.    As alleged herein, the actions by Defendant Murray were objectively unreasonable, excessive, absent any lawful justification and/or excuse, and was in keeping with the pattern practice, policy and/or custom of Defendants Baltimore and BPD.

215.    Under the Fourth and Fourteenth Amendments to the United States Constitution, Defendants Baltimore and BPD are prohibited from allowing, enabling, and facilitating its officers to engage in a pattern, practice, policy, or custom of violating citizens' constitutional rights and are obligated to train and supervise Baltimore City police officers in the recognition and handling of incidents of misuse of police powers and rights violations committed by Baltimore City police officers, as well as recognizing patterns of systemic perpetuation of the same.

216.    Baltimore City police officers, including Defendant Murray, persistently engaged in a widespread practice of unconstitutional conduct of unlawfully seizing and using excessive

force against citizens. It was of such a duration and frequency such that it had become customary and standard operating procedure among Baltimore City police officers, and Defendants Baltimore and BPD knew or should have known of the widespread violations.

217.    By establishing, executing, implementing, enforcing, directing, supervising and/or controlling polices, customs, practices, usages, and procedures to be used by Defendants Baltimore and BPD's officials and officers, Defendants, while acting under color of law, engaged in a pattern and practice of unconstitutional conduct.

218.    Thus, the deprivation of Mr. Rochester's rights, as described herein, represents not a single isolated, accidental, or peculiar event, but occurrences in the regular procedures followed by these officers, constituting an illegal pattern or practice of such conduct.

219.    Defendants Baltimore and BPD engaged in a pattern, practice, policy, or custom of allowing, enabling, and/or facilitating Baltimore City police officers to use excessive and unlawful force in connection with subduing and/or apprehending individuals. Defendants Baltimore and BPD have also engaged in a pattern, practice, policy, or custom of allowing, enabling, and facilitating Baltimore City police officers to conduct unlawful seizures and has permitted officers to commit further unlawful uses of various types of police force and conduct.

220.    At all relevant times, Defendants Baltimore and BPD maintained a custom, policy, and/or practice of condoning officers' conduct in knowingly, consciously, and repeatedly failing to stop or correct the widespread pattern of unconstitutional uses of force and seizures.

221.    Defendants Baltimore and BPD, through specific intent or deliberate indifference, failed to correct and otherwise hold Defendant Murray and other Baltimore City police officers accountable for their abuse of police powers and continued and repeated unconstitutional uses of force and unlawful seizures. By failing to correct the officers' pervasive constitutional violations,

including Defendant Murray, Defendants Baltimore and BPD condoned the pattern and practice of unconstitutional use of force, unlawful seizures, and abuse of police powers by its officers, including Defendant Murray.

222.    In addition, Defendants Baltimore and BPD caused their employees to believe that conducting their law enforcement activities unconstitutionally, illegally, and in violation of BPD's policies and regulations would not be aggressively, honestly, and properly investigated.

223.    Defendants Baltimore and BPD should have foreseen that such policies would promote the proliferation of constitutional violations of citizens' rights, without justification, due process, or probable cause.

224.    Defendants Baltimore and BPD acted with reckless disregard for or with deliberate indifference to whether Mr. Rochester's rights would be violated by their actions and that such actions were the moving force in violating Mr. Rochester's rights.

225.    Defendants Baltimore and BPD have failed to take even elementary steps to protect citizens from the type of abuses detailed herein.

226.    As a direct and proximate result of Defendants' actions or omissions identified herein, Mr. Rochester sustained significant physical, emotional, mental, and financial injuries, including, but not limited to mental and physical pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses.

227.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

228.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages and injunctive relief, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

<u>COUNT X</u>
**Unconstitutional Pattern or Practice**
***Longtin* Claim**
**(Against Defendants State, Baltimore, and BPD)**

229.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

230.    Mr. Rochester's constitutional rights were violated as described elsewhere herein.

231.    Defendants State, Baltimore, and BPD are responsible for setting policy and procedures governing the conduct of Baltimore City police officers.

232.    Defendants State, Baltimore, and BPD maintained policies, customs, patterns and practices in the Baltimore City police department of violating the constitutional rights of people in Baltimore City to be free from excessive force.

233.    Defendants State, Baltimore, and BPD's policies, customs, patterns and practices of violating the constitutional rights of people in Baltimore City were the actual direct and proximate cause, as well as the moving force, behind the violation of Mr. Rochester's constitutional rights.

234.    The above-described policies, customs, patterns and practices of Defendants State, Baltimore, and BPD are so widespread as to rise to the level of official policy promulgated by Defendants.

235.    Defendants State, Baltimore, and BPD failed to ensure that their police officers conducted their law enforcement activities within constitutional bounds.  Further, Defendants State, Baltimore, and BPD have permitted and tolerated a pattern and practice of unjustified, unreasonable, and unlawful abuses of their officers' law enforcement authority, constituting a pattern or practice of law enforcement officers employed by Defendants conducting their law enforcement activities unconstitutionally.  This unconstitutional pattern or practice has resulted in officers employed by Defendants consistently and continuously violating citizens' constitutional rights, including maliciously pursuing prosecution without probable cause, failing to conduct full and complete investigations, and routinely ignoring exculpatory evidence.

236.    Thus, the deprivation of Mr. Rochester's rights, as described herein, represents not a single isolated, accidental, or peculiar event, but occurrences in the regular procedures followed by these officers, constituting an illegal pattern or practice of such conduct.

237.    Defendants State, Baltimore, and BPD are aware of, or, in the alternative, should have been aware of, the illegal pattern or practice of their officers conducting their law enforcement activities unconstitutionally.

238.    In addition, Defendants State, Baltimore, and BPD caused their employees to believe that conducting their law enforcement activities unconstitutionally would not be aggressively, honestly, and properly investigated by failing to adequately discipline officers engaging in such misconduct.

239.     Defendants State, Baltimore, and BPD have instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage employees to violate the rights of citizens.

240.     This is a result of Defendants State, Baltimore, and BPD's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that such violations do not occur and to ensure that allegations of such violations will be thoroughly investigated and appropriately punished when found to have occurred.  As a result of this failure, there has been a regular pattern and practice of conduct similar to that complained of here.  This pattern and practice has been manifested in other prior incidents against Defendants State, Baltimore, and BPD, as outlined herein.

241.     Defendants State, Baltimore, and BPD have failed and refused to take even elementary steps to protect citizens from the type of abuses detailed above.

242.     The policies and customs of Defendants State, Baltimore, and BPD, as set forth herein, demonstrate a gross disregard for the constitutional and other rights of the public and Mr. Rochester, and were a proximate cause of Mr. Rochester's untimely and unjustified death.

243.     In addition to the affirmative policy of unconstitutionally utilizing excessive force as described above, Defendants State, Baltimore, and BPD maintain policies, customs, patterns, and practices of inadequately training officers to avoid unconstitutionally utilizing excessive force.

244.     This failure to train officers to avoid unconstitutionally utilizing excessive force amounts to deliberate indifference to the rights of persons with whom the police come into contact.

245.     The training and retention procedures of Defendants State, Baltimore, and BPD are so inadequate as to demonstrate deliberate indifference in adopting the hiring and training policies

and these inadequate hiring or training policies directly caused Mr. Rochester's untimely and unjustified death.

246.    Defendants State, Baltimore, and BPD had actual and constructive knowledge of continuing constitutional violations and failed to carry out their duty to correct them.

247.    Defendants State, Baltimore, and BPD have both explicitly and tacitly approved of the type of misconduct of police officers which is the subject of this lawsuit.

248.    Dozens of people have sued Defendants State, Baltimore, and BPD over the type of misconduct of police officers which is the subject of this lawsuit. Many more individuals have been subjected to unconstitutional excessive force by Baltimore City police officers who have not filed claims. Examples of prior misconduct are outlined in the fact section herein.

249.    As a direct and proximate result of Defendants' actions or omissions identified herein, Mr. Rochester sustained significant physical, emotional, mental, and financial injuries, including, but not limited to mental and physical pain and suffering, mental anguish, humiliation, disgrace, loss of dignity, and other expenses.

250.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, for which Mr. Rochester would have been able to maintain an action and recover damages had he lived, Defendant Murray unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive lethal force against Mr. Rochester which resulted in Mr. Rochester's untimely death.

251.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Rochester, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of protection.

**WHEREFORE**, Plaintiffs respectfully request compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages and injunctive relief, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

## COUNT XI
### Indemnification
### (Against Defendants Baltimore and BPD)

252. Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

253. Under the Local Government Tort Claims Act, Md. Code, Cts. & Jud. Proc. §§ 5-301 et seq. (the "**LGTCA**"), a local government is liable "for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." § 5-303(b)(1).

254. A local government is not permitted to assert any "governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection." § 5-303(b)(2).

255. At all times relevant to this Complaint, Defendant Murray was an "employee" as defined under the LGTCA. § 5-301(c).

256. At all times relevant to this Complaint, Defendant Baltimore was a "local government" as defined under the LGTCA. § 5-301(d)(4).

257. At all times relevant to this Complaint, Defendant BPD was a "local government" as defined under the LGTCA. § 5-301(d)(21).

258.    Defendants Baltimore and BPD had actual notice of Mr. Rochester's injury and/or the defect or circumstances giving rise to Mr. Rochester's injury within one year after the injury pursuant to the LGTCA. § 5-304.

259.    The claims raised in this Complaint arise from tortious acts or omissions committed by Defendant Murray within the scope of his employment.

260.    Accordingly, Defendants Baltimore and BPD are liable to pay for any judgment entered against Defendant Murray in this case.

261.    In addition, this is a cause of action for declaratory judgment pursuant to Md. Code, Cts. & Jud. Proc. § 3-409, for the purpose of determining a question of actual controversy between the parties and terminating uncertainty and controversy giving rise to this proceeding.

262.    Further, this is a cause of action for declaratory judgment pursuant to 28 U.S.C. §§ 2201, et seq., for the purpose of determining a question of actual controversy between the parties and terminating uncertainty and controversy giving rise to this proceeding.

263.    Pursuant to 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought," "upon the filing of an appropriate pleading."

264.    Declaratory judgment may be sought "in a case of actual controversy within its jurisdiction."

265.    There exists an actual controversy of justiciable issue between Plaintiffs and Defendants Baltimore and BPD within the jurisdiction of this Court, involving the rights and liabilities of the parties, with respect to indemnification of any judgment entered against Defendant Murray.

266.    Antagonistic claims are present between the parties. These claims indicate imminent and inevitable litigation.

267.    A declaratory judgment by this Court will terminate this controversy.

**WHEREFORE**, Plaintiff seeks a declaration that Defendants Baltimore and BPD must pay for any judgment entered against Defendant Murray if Defendant Murray is found liable for any claim raised in this Complaint, in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs and attorneys' fees, and any other relief deemed appropriate by this Court.

## JURY TRIAL DEMAND

Plaintiffs respectfully demand a jury as to all claims so triable.

Respectfully submitted,

HANSEL LAW, P.C.

*/s/ Cary J. Hansel*
Cary J. Hansel (AIS No. 9912150020)
2514 North Charles Street
Baltimore, Maryland 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
cary@hansellaw.com
*Counsel for Plaintiffs*

## IN THE CIRCUIT COURT
## FOR BALTIMORE CITY, MARYLAND

**DANIELLE BROWN**
*Individually and as the Personal Representative*
*of the Estate of Donnell R. Rochester*
c/o Hansel Law, P.C.
2514 North Charles Street
Baltimore, Maryland 21218

    *Plaintiff,*

 vs.

**STATE OF MARYLAND**
  Serve: Nancy K. Kopp
      State of Maryland
      Treasurer's Office
      80 Calvert Street
      Goldstein Treasury Building
      Annapolis, Maryland 21401

and

**MAYOR AND CITY COUNCIL OF THE**
**CITY OF BALTIMORE**
100 North Holliday Street
Baltimore, Maryland 21202

and

**BALTIMORE POLICE DEPARTMENT**
601 East Fayette Street
Baltimore, Maryland 21202

and

**OFFICER CONNOR MURRAY**
*Individually and in his Official Capacity as*
*a Baltimore City Police Officer*
601 East Fayette Street
Baltimore, Maryland 21202

    *Defendants.*

**\*Jury Trial Demanded\***

**Civil Case No. _____**

66

## LINE REGARDING SUMMONS

Dear Sir/Madam Clerk:

    Kindly accept the attached Complaint for filing, issue summons thereon, and return to undersigned counsel for service by private process.

                    Respectfully submitted,

                    HANSEL LAW, P.C.

                    */s/ Cary J. Hansel*
                    Cary J. Hansel (AIS No. 9912150020)
                    2514 North Charles Street
                    Baltimore, Maryland 21218
                    Phone: (301) 461-1040
                    Fax: (443) 451-8606
                    cary@hansellaw.com
                    *Counsel for Plaintiffs*

IN THE CIRCUIT COURT FOR Baltimore City
(City/County)

## CIVIL – NON-DOMESTIC CASE INFORMATION SHEET

### DIRECTIONS

*Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Justice of the Supreme Court of Maryland pursuant to Rule 2-111(a).

  *Defendant:* You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

**FORM FILED BY:** ☒ PLAINTIFF ☐ DEFENDANT    CASE NUMBER _____ (Clerk to insert)

**CASE NAME:** Danielle Brown                vs.    State of Maryland, et al.

**PARTY'S NAME:** Danielle Brown  *Plaintiff*        **PHONE:**  *Defendant*

**PARTY'S ADDRESS:** _____

**PARTY'S E-MAIL:** _____

If represented by an attorney:

**PARTY'S ATTORNEY'S NAME:**  Cary Hansel        PHONE: 301-461-1040

**PARTY'S ATTORNEY'S ADDRESS:**  2514 North Charles Street, Baltimore, Maryland 21218

**PARTY'S ATTORNEY'S E-MAIL:**  cary@hansellaw.com

**JURY DEMAND?** ☒ Yes ☐ No

**RELATED CASE PENDING?** ☐ Yes ☒ No  If yes, Case #(s), if known: _____

**ANTICIPATED LENGTH OF TRIAL?:** _____ hours  5  days

### PLEADING TYPE

**New Case:** ☒ Original     ☐ Administrative Appeal     ☐ Appeal
**Existing Case:** ☐ Post-Judgment     ☐ Amendment
*If filing in an existing case,* skip Case Category/ Subcategory section – go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (*Check one box.*)

**TORTS**
- ☐ Asbestos
- ☐ Assault and Battery
- ☐ Business and Commercial
- ☐ Conspiracy
- ☐ Conversion
- ☐ Defamation
- ☐ False Arrest/Imprisonment
- ☐ Fraud
- ☐ Lead Paint – DOB of Youngest Plt:
- ☐ Loss of Consortium
- ☐ Malicious Prosecution
- ☐ Malpractice-Medical
- ☐ Malpractice-Professional
- ☐ Misrepresentation
- ☐ Motor Tort
- ☐ Negligence
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability
- ☐ Specific Performance
- ☐ Toxic Tort
- ☐ Trespass
- ☐ Wrongful Death

**CONTRACT**
- ☐ Asbestos
- ☐ Breach
- ☐ Business and Commercial
- ☐ Confessed Judgment (Cont'd)
- ☐ Construction
- ☐ Debt
- ☐ Fraud

- ☐ Government
- ☐ Insurance
- ☐ Product Liability

**PROPERTY**
- ☐ Adverse Possession
- ☐ Breach of Lease
- ☐ Detinue
- ☐ Distress/Distrain
- ☐ Ejectment
- ☐ Forcible Entry/Detainer
- ☐ Foreclosure
  - ☐ Commercial
  - ☐ Residential
  - ☐ Currency or Vehicle
  - ☐ Deed of Trust
  - ☐ Land Installments
  - ☐ Lien
  - ☐ Mortgage
  - ☐ Right of Redemption
  - ☐ Statement Condo
- ☐ Forfeiture of Property / Personal Item
- ☐ Fraudulent Conveyance
- ☐ Landlord-Tenant
- ☐ Lis Pendens
- ☐ Mechanic's Lien
- ☐ Ownership
- ☐ Partition/Sale in Lieu
- ☐ Quiet Title
- ☐ Rent Escrow
- ☐ Return of Seized Property
- ☐ Right of Redemption
- ☐ Tenant Holding Over

**PUBLIC LAW**
- ☐ Attorney Grievance
- ☐ Bond Forfeiture Remission
- ☒ Civil Rights
- ☐ County/Mncpl Code/Ord
- ☐ Election Law
- ☐ Eminent Domain/Condemn.
- ☐ Environment
- ☐ Error Coram Nobis
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Prisoner Rights
- ☐ Public Info. Act Records
- ☐ Quarantine/Isolation
- ☐ Writ of Certiorari

**EMPLOYMENT**
- ☐ ADA
- ☐ Conspiracy
- ☐ EEO/HR
- ☐ FLSA
- ☐ FMLA
- ☐ Worker's Compensation
- ☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
- ☐ Assumption of Jurisdiction
- ☐ Authorized Sale
- ☐ Attorney Appointment
- ☐ Body Attachment Issuance
- ☐ Commission Issuance

- ☐ Constructive Trust
- ☐ Contempt
- ☐ Deposition Notice
- ☐ Dist Ct Mtn Appeal
- ☐ Financial
- ☐ Grand Jury/Petit Jury
- ☐ Miscellaneous
- ☐ Perpetuate Testimony/Evidence
- ☐ Prod. of Documents Req.
- ☐ Receivership
- ☐ Sentence Transfer
- ☐ Set Aside Deed
- ☐ Special Adm. – Atty
- ☐ Subpoena Issue/Quash
- ☐ Trust Established
- ☐ Trustee Substitution/Removal
- ☐ Witness Appearance-Compel

**PEACE ORDER**
- ☐ Peace Order

**EQUITY**
- ☐ Declaratory Judgment
- ☐ Equitable Relief
- ☐ Injunctive Relief
- ☐ Mandamus

**OTHER**
- ☐ Accounting
- ☐ Friendly Suit
- ☐ Grantor in Possession
- ☐ Maryland Insurance Administration
- ☐ Miscellaneous
- ☐ Specific Transaction
- ☐ Structured Settlements

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

| | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Default | ☐ Reinstatement of Employment |
| ☐ Administrative Action | ☐ Enrollment | ☐ Judgment-Interest | ☐ Return of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Arbitration | ☐ Financial Exploitation | ☐ Liability | ☐ Specific Performance |
| ☐ Asset Determination | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Attachment b/f Judgment | ☐ Foreclosure | ☐ Order | ☐ Writ-Execution |
| ☐ Cease & Desist Order | ☒ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Condemn Bldg | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Contempt | ☐ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☒ Court Costs/Fees | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☒ Damages-Compensatory | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☒ Damages-Punitive | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |

*If you indicated **Liability** above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.    ☐ Liability is not conceded, but is not seriously in dispute.    ☐ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000    ☐ $10,000 - $30,000    ☐ $30,000 - $100,000    ☒ Over $100,000

☐ Medical Bills $ _____    ☐ Wage Loss $ _____    ☐ Property Damages $ _____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

| | | | | |
|---|---|---|---|---|
| A. Mediation | ☐ Yes ☒ No | | C. Settlement Conference | ☐ Yes ☒ No |
| B. Arbitration | ☐ Yes ☒ No | | D. Neutral Evaluation | ☐ Yes ☒ No |

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*

### (Case will be tracked accordingly)

☐ 1/2 day of trial or less    ☐ 3 days of trial time
☐ 1 day of trial time    ☐ More than 3 days of trial time
☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

***For all jurisdictions,*** *if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited -** Trial within 7 months of    ☐ **Standard -** Trial within 18 months of
Defendant's response    Defendant's response

EMERGENCY RELIEF REQUESTED

| COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR) |
|---|

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited -** Trial within 7 months of Defendant's response          ☐ **Standard -** Trial within 18 months of Defendant's response

***IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.***

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Civil-Short | Trial 210 days from first answer. |
| ☒ Civil-Standard | Trial 360 days from first answer. |
| ☐ Custom | Scheduling order entered by individual judge. |
| ☐ Asbestos | Special scheduling order. |
| ☐ Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ Tax Sale Foreclosures | Special scheduling order. |
| ☐ Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ☐ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

February 18, 2025
_____
Date

2514 North Charles Street
_____
Address

Baltimore          Maryland  21218
_____
City              State        Zip Code

/s/ Cary Hansel                    9912150020
_____    _____
Signature of Attorney / Party          Attorney Number

Cary Hansel
_____
Printed Name