## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **DANIELLE BROWN** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civil Case No.: SAG-25-01331** |
| **v.** | * | |
| | * | |
| **STATE OF MARYLAND,** *et al.* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Danielle Brown ("Plaintiff") brings this action against the Baltimore Police Department (the "BPD"), the Mayor and City Council of the City of Baltimore (the "City"), the State of Maryland (the "State"), and BPD Officer Connor Murray ("Defendant Murray") for claims arising out of the death of her son, Donnell R. Rochester. ECF 3. Each defendant filed a motion to dismiss the respective claims against them, ECF 9, 10, 11, 12, which Plaintiff opposed, ECF 21, 22, 23, 24. Each defendant then filed a reply. ECF 31, 32, 33. This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons explained below, the City's and the State's motions will be granted, and the BPD's and Defendant Murray's motions will be granted in part and denied in part.

### I.    BACKGROUND

The following facts are derived from Plaintiff's complaint, ECF 3, and are assumed to be true for purposes of these motions.

#### A.  The Death of Mr. Rochester

On February 19, 2022, BPD Officers Robert Mauri and Antoine Galloway were on patrol running vehicle license plates. *Id.* at ¶ 21. They ran Mr. Rochester's license plate, discovered

that he had warrants for failure to appear on underlying charges of carjacking and robbery, and identified the driver of the vehicle as Mr. Rochester. *Id.* at ¶¶ 22–23. They then reported this information over the radio. *Id.* at ¶ 25. Officers Mauri and Galloway followed Mr. Rochester's vehicle, and Defendant Murray and Officer Joshua Lutz, also of the BPD, joined them in a marked patrol vehicle. *Id.* at ¶ 26. Officer Mauri then activated his emergency lights, and Mr. Rochester's vehicle accelerated away. *Id.* at ¶ 27. The Officers did not commence a vehicle pursuit at that point because they did not have reason to believe that Mr. Rochester posed an immediate threat. *Id.* at ¶ 28.

After temporarily losing sight of Mr. Rochester's vehicle, the Officers saw the vehicle and Mr. Rochester outside of the vehicle several blocks away. *Id.* at ¶¶ 30, 32–33. Mr. Rochester saw the Officers and ran back to his vehicle. *Id.* at ¶ 33. Officer Lutz then ran toward the passenger door of Mr. Rochester's vehicle, Officer Galloway ran toward the driver's door, Officer Mauri ran toward the vehicle along the sidewalk, and Defendant Murray ran down the center of the street toward the front of the vehicle. *Id.* at ¶¶ 35–36. Defendant Murray and Officers Galloway and Mauri each drew their firearms as they approached the vehicle, and two of the Officers yelled at Mr. Rochester to stop and to get out of the vehicle. *Id.* at ¶¶ 37–39. Mr. Rochester's vehicle began moving forward at approximately 3:13:02 PM, at which time Defendant Murray was about twenty feet in front of it. *Id.* at ¶ 41. Defendant Murray fired at the vehicle three times; none of these shots hit Mr. Rochester. *Id.* at ¶ 42. As the vehicle continued moving forward, the front of the vehicle passed Defendant Murray without hitting him. *Id.* at ¶ 43. At 3:13:04 PM, as the vehicle was about halfway past Defendant Murray, he fired a fourth shot through the front passenger window that hit Mr. Rochester. *Id.* at ¶¶ 43, 45. Shortly thereafter, Mr. Rochester died from that gunshot wound. *Id.* at ¶¶ 54–56.

B.  Defendant Murray's Training

In June, 2021, Defendant Murray completed a training entitled "Firing at Moving Vehicles E-Learning." *Id.* at ¶ 69. The training instructed that firing at a moving vehicle almost never constitutes a safe or effective way of stopping the vehicle. *Id.* at ¶ 70. The training discussed a case study in which an officer had fired at a vehicle after moving out of its way. *Id.* at ¶ 71. The training stated that firing at the vehicle in that circumstance was inappropriate because the officer had eliminated any threat from the vehicle by stepping out of its path. *Id.* Defendant Murray completed another training that year regarding use of force that instructed officers not to fire at a moving vehicle, not to place themselves in the path of a moving vehicle, and to continuously assess the changing circumstances of a situation. *Id.* at ¶¶ 73–74. According to Plaintiff, Defendant Murray shot Mr. Rochester "[d]espite this training," because, as a result of the training, "Defendant Murray knew or should have known" that his conduct was inappropriate but failed to follow the policies discussed in the training. *Id.* at ¶¶ 69, 76–79. Plaintiff further alleges that a reasonable officer would have followed the policies contained in the training programs had they been adequately trained. *Id.* at ¶ 79. According to Plaintiff, the BPD failed to adequately train its officers. *Id.* at ¶¶ 81, 198–200, 204–05.

C.  The BPD's Alleged History of Misconduct

In 2016, the Department of Justice (the "DOJ") released a report based on an investigation it conducted of the BPD. *Id.* at ¶ 82. The DOJ found that the BPD had a widespread practice of using excessive force that was encouraged by systemic deficiencies in policies, training, supervision, and accountability structures. *Id.* at ¶¶ 84–85. The DOJ found that BPD officers often used force against fleeing individuals that was disproportionate to the suspected crime and the threat posed by the individual. *Id.* at ¶ 86. The report included several cases in which officers fired

shots at fleeing vehicles after the vehicle no longer posed a serious threat to officers. *Id.* at ¶¶ 87–88.

The DOJ concluded that the BPD's initial and annual training on use of force was deficient and failed to provide officers with the skills necessary to use force in a safe and constitutional manner. *Id.* at ¶ 90. The DOJ also concluded that the DOJ failed to adequately supervise its officers, failed to collect and analyze data regarding its officers' use of force, discouraged the filing of complaints, misclassified complaints, conducted little to no investigation of complaints, failed to sustain complaints, failed to apply discipline consistently, and permitted cover-ups. *Id.* at ¶¶ 92–94. Following this report, the City and the BPD entered a consent decree with the federal government that mandated measures to ensure officer conduct comported with applicable laws, but Plaintiff alleges that the BPD has not fully complied with the consent decree and that BPD officers continue to engage in excessive force. *Id.* at ¶¶ 98–99, 102–03. Plaintiff's complaint details several incidents from 1997–2018 involving allegedly excessive force by BPD officers that resulted in settlements. *Id.* at ¶ 104. Plaintiff contends that the BPD knowingly failed to correct a widespread and persistent pattern of unconstitutional conduct and caused officers to believe such conduct would go uninvestigated. *Id.* at ¶¶ 107, 222.

D. Plaintiff's Claims

Plaintiff, Mr. Rochester's mother, brings this action in her individual capacity and as the personal representative of Mr. Rochester's estate. *Id.* at ¶ 16. Count I alleges wrongful death against all defendants. *Id.* at ¶¶ 111–21. Count II alleges a survivorship claim against all defendants. *Id.* at ¶¶ 122–29. Count III alleges an excessive force claim pursuant to 42 U.S.C. § 1983 against Defendant Murray. *Id.* at ¶¶ 130–45. Count IV alleges an excessive force claim under Articles 24 and 26 of the Maryland Declaration of Rights against all defendants. *Id.* at

¶¶ 146–62. Count V alleges battery against all defendants. *Id.* at ¶¶ 163–73. Count VI alleges negligence against all defendants. *Id.* at ¶¶ 174–80. Count VII alleges gross negligence against Defendant Murray. *Id.* at ¶¶ 181–90. Count VIII alleges negligent training, supervision, hiring, and retention against the State, the City, and the BPD. *Id.* at ¶¶ 191–208. Count IX raises an unconstitutional pattern and practice claim pursuant to 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978), against the City and the BPD. *Id.* at ¶¶ 209–28. Count X alleges an unconstitutional pattern and practice claim under Articles 24 and 26 of the Maryland Declaration of Rights against the State, the City, and the BPD. *Id.* at ¶¶ 229–51. Count XI alleges a claim for indemnification against the City and the BPD. *Id.* at ¶¶ 252–67. Plaintiff has sued Defendant Murray both individually and in his official capacity. *Id.* She seeks damages in an amount to be determined at trial, including any available punitive damages. *See, e.g.*, *id.* at ¶ 267.

## II.    LEGAL STANDARD

A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In reviewing a Rule 12(b)(6) motion, a court "must accept as

true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). But if a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555.

## III. DISCUSSION

The pending motions seek to dismiss all of the claims in Plaintiff's complaint. The BPD argues that (1) it enjoys sovereign immunity from Plaintiff's state law claims, (2) Plaintiff has failed to state an unconstitutional pattern and practice claim under *Monell*, (3) the indemnification claim is not yet ripe as this Court has not yet entered a judgment against Defendant Murray, and (4) punitive damages are not available. The City contends that, at the times pertinent to this case, it had no control over the BPD and therefore is not liable for the conduct of its officers. The State argues that sovereign immunity bars all of the claims lodged against it. Finally, Defendant Murray contends that (1) a suit against him in his official capacity cannot lie; (2) he is entitled to public official immunity; (3) Plaintiff has failed to sufficiently state a claim of excessive force; (4) in the alternative, he is entitled to qualified immunity; and (5) Plaintiff has failed to sufficiently state several state law claims. This Court will address the claims against each defendant in turn.

### A. Claims Against the BPD

#### 1. State Law Claims

Unless waived, state sovereign immunity precludes actions against the State of Maryland or its agencies. *Est. of Anderson v. Strohman*, 6 F. Supp. 3d 639, 642 (D. Md. 2014). At the time of the events underlying this lawsuit, the BPD existed as a state agency. *Id.*; *see also Yampierre v.*

*Balt. Police Dep't*, Civ. No. ELH-21-1209, 2023 WL 6049489, at *40 (D. Md. Sept. 15, 2023) (describing how the BPD became a city agency on January 1, 2023). Accordingly, the BPD enjoys state sovereign immunity from damage actions based on both state common law torts and state constitutional torts. *Burley v. Balt. Police Dep't*, 422 F. Supp. 3d 986, 1026 (D. Md. 2019).

Plaintiff's argument that the Local Government Tort Claims Act ("LGTCA") converted the BPD into a local government agency is unavailing. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-301(d)(21) (defining "[l]ocal government," in part, as the "Baltimore City Police Department"). First, the fact that the LGTCA designates an entity as a local government for the purposes of that Act does not transform the BPD into a local government for any other purpose. *Balt. Police. Dep't v. Cherkes*, 140 Md. App. 282, 323 (2001). Rather, the defined terms in the LGTCA, including "local government," apply only to the LGTCA itself. *Id.* (citing § 5-301). The entities designated as local governments under the LGTCA, including libraries and nonprofit corporations, are treated as local governments for the purposes of the LGTCA but do not otherwise become local governments. *See Cherkes*, 140 Md. App. at 324. Second, the BPD's designation as a local government for the purposes of the LGTCA did not waive the sovereign immunity that the BPD asserts here. The LGTCA waived only "governmental or sovereign immunity to avoid the duty to defend or indemnify an employee." *Id.* at 323 (quoting § 5-303(b)(2)). Indeed, the LGTCA explicitly states that notwithstanding that waiver, the Act does not waive any common law immunity. § 5-303(d). Thus, "by adding the BPD to the list of local governments in the LGTCA the General Assembly waived BPD's common law State sovereign immunity only to the extent of the statutory duties to defend and indemnify. Otherwise, the BPD's State sovereign immunity remains intact." *Grim v. Balt. Police Dep't*, 2019 WL 5865561, at *27 (D. Md. Nov. 8, 2019)

(quoting *Cherkes*, 140 Md. App. at 323). Accordingly, this Court will dismiss all of the state law claims against the BPD.

### 2. *Monell* Claim

Section 1983 provides a cause of action against "any person" who, under color of state law, deprives a person of a constitutional right. 42 U.S.C. § 1983. Municipalities may be subject to § 1983 liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). There are three necessary elements for *Monell* liability. First, the plaintiff must plausibly allege that the plaintiff's constitutional harm stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); *see also Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987). As interpreted by the Fourth Circuit, a "policy or custom" can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality. *Spell*, 824 F.2d at 1389; *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) ("Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the *sine qua non* of *Monell* liability."). Third, the plaintiff must allege an affirmative causal link between the "policy or custom," and the particular injury suffered by the plaintiff. *Spell*, 824 F.2d at 1389.

### i. Failure to Train

A municipality may be liable for an established "policy" through a failure to train, if it "reflects a deliberate or conscious choice" to not do so. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Training policy deficiencies can include (1) "express authorizations of unconstitutional conduct," (2) "tacit authorizations" of such unconstitutional conduct, and (3) failures to adequately "prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty." *Spell*, 824 F.2d at 1390. No matter which theory is alleged, the plaintiff must point out "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training." *Id.* The municipality will be liable only if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 390.

As courts in this District have made clear, a plaintiff must provide factual allegations about the specific deficiencies in the BPD's training to state a failure to train claim. *See, e.g.*, *McDowell v. Grimes*, Civ. No. GLR-17-3200, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018); *Peters v. City of Mount Rainier*, No. GJH-14-955, 2014 WL 4855032, at *5 (D. Md. Sept. 29, 2014); *Hall v. Fabrizio*, Civ. No. JKB-12-754, 2012 WL 2905293, at *2 (D. Md. July 13, 2012). Stating "in broad, conclusory terms and in a variety of different ways that [an entity] failed to train and supervise its officers" will not suffice. *Peters*, 2014 WL 4855032, at *5.

Plaintiff has failed to plead specific deficiencies in the BPD's training of its officers. Plaintiff's allegations concerning the BPD's training are primarily general and conclusory statements that the BPD failed to adequately train its officers. *See, e.g.*, ECF 3 at ¶¶ 81, 198–200, 204–05. Plaintiff at times identifies a particular failure to train officers in the use of force and to avoid the use of excessive force. *Id.* at ¶¶ 85, 90, 243–44. Although these allegations come closer

to achieving the specificity required, they still fail to reach that threshold. These allegations mirror those in *Ross v. Prince George's County*, in which this Court rejected allegations regarding a failure "to adequately train and supervise officers in the proper use of force" and "investigate, discipline, and record acts of excessive force" as conclusory. Civ. No. DKC 11-1984, 2012 WL 1204087, at *9 (D. Md. Apr. 10, 2012); *see also McDowell*, 2018 WL 3756727, at *4 (rejecting allegations that the BPD had failed to adequately train its officers to not "arrest without probable cause, file false charges, and use excessive force against citizens" because they did not identify any factual details about the training or what it lacked).

The only details regarding training that Plaintiff provides relate to two computer-based training programs that Officer Murray received. However, Plaintiff alleges that, from this training, "Defendant Murray knew or should have known" that his conduct was inappropriate and that Defendant Murray failed to follow the policies discussed in the training programs such that the incident occurred "[d]espite this training," rather than because of it. ECF 3 at ¶¶ 69, 76–79. Plaintiff therefore fails to allege that the training programs caused the death of Mr. Rochester and instead affirmatively refutes such an allegation. Although Plaintiff further asserts that a reasonable officer would have followed the policies contained in the training programs had they been adequately trained, *id.* at ¶ 79, this allegation is, again, conclusory. Plaintiff therefore fails to state a failure to train theory of *Monell* liability.

ii.    Condonation

A municipality is liable under a condonation theory "if municipal policymakers fail 'to put a stop to[,] or correct[,] a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). To plausibly allege *Monell* liability by condonation, a plaintiff must state facts showing "a persistent and widespread practice of municipal officials, the

duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Id.* at 402–03 (internal alterations and quotations omitted) (quoting *Spell*, 824 F.2d at 1386–91). Both elements "can be inferred from the 'extent' of employees' misconduct." *Id.* (quoting *Spell*, 824 F.2d at 1391). While "[p]revailing under such a theory is no easy task . . . alleging such a claim is, by definition, easier." *Id.* at 403. At this stage, a plaintiff need not allege past instances establishing a custom with specificity. *See Owens*, 767 F.3d at 403 (concluding that allegations that "reported and unreported cases from the period of time before and during the events complained of" and "a number of motions were filed and granted during this time period" plausibly supported a *Monell* claim).

Plaintiff has sufficiently pled a claim based on a condonation theory. Plaintiff has alleged that the DOJ reviewed several incidents in which BPD officers used force against fleeing individuals that was disproportionate to the suspected crime and the threat posed by the individual. ECF 3 at ¶ 86. Plaintiff specifically mentions several cases in which officers fired shots at fleeing vehicles after the vehicle no longer posed a serious threat to officers. *Id.* at ¶¶ 87–88. Plaintiff has also made detailed factual allegations regarding several particular instances from 1997–2018 involving excessive force by BPD officers. *Id.* at ¶ 104. These well-pleaded facts give rise to the reasonable inference that policymakers within the BPD had actual or constructive knowledge of a pattern of excessive force employed by BPD officers. Furthermore, Plaintiff's factual allegations that the BPD failed to collect and analyze data on the use of force, discouraged the filing of complaints, misclassified complaints, conducted little to no investigation of complaints, failed to sustain complaints, failed to apply discipline consistently, and permitted cover-ups in use of force cases render the BPD's deliberate indifference to the pattern of excessive force plausible. *Id.* at

¶¶ 92–94. Particularly in light of complaints in other cases that, without containing any specific past incidents of misconduct, have been determined to adequately plead a policy by condonation, Plaintiff's allegations more than suffice at this stage. *See Owens*, 767 F.3d at 403; *see also McDowell*, 2018 WL 3756727, at *5 (citing *Jones v. Jordan*, Civ. No. GLR-16-2662, 2017 WL 4122795, at *9 (D. Md. Sept. 18, 2017); *Johnson v. Holmes*, 204 F.Supp.3d 880, 892 (W.D. Va. 2016); *Jones v. Chapman*, Civ. No. ELH-14-2627, 2015 WL 4509871, at *5, *17 (D. Md. July 24, 2015)).

Merely alleging that the BPD condoned an unconstitutional policy does not automatically give rise to a *Monell* claim, though. Plaintiffs must also plausibly allege that the condoned policy or custom has an affirmative causal link to their particular constitutional violation. *Spell*, 824 F.2d at 1391. This causal link is satisfied "if occurrence of the specific violation [alleged] was made reasonably probable by permitted continuation of the custom," such that the specific violation was "almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Id.* (internal quotations omitted); *see also, e.g.*, *Carter*, 164 F.3d at 218 (quoting *Spell*, 824 F.2d at 1390).

As the Fourth Circuit has recognized, however, at the pleading stage, "[t]here is no requirement that" the plaintiff "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish . . . causation." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339 (4th Cir. 1994). Indeed, in holding that only the notice pleading requirements of Federal Rule of Civil Procedure 8 applied to *Monell* claims, the Supreme Court stated, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168–69 (1993). Courts in this District have heeded this call and held that a plaintiff need only

allege that the municipality "was aware of ongoing constitutional violations," and that this awareness allowed the custom of unconstitutional practices to continue developing. *Garcia v. Montgomery County*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013); *see also, e.g.*, *McDowell*, 2018 WL 3756727, at *6; *J.A. v. Miranda*, Civ. No. PX-16-3953, 2017 WL 3840026, at *7 (D. Md. Sept. 1, 2017). Plaintiff has done so by alleging that the BPD knowingly failed to correct a widespread and persistent pattern of unconstitutional conduct and caused officers to believe that such conduct would go uninvestigated. ECF 3 at ¶¶ 107, 222.

The BPD argues that the past instances of excessive force cited by Plaintiff fail to establish a custom because they resulted in settlements without any finding that the underlying conduct was unconstitutional and their facts are not sufficiently similar to the facts here. The resolution of such fact-intensive questions, however, is inappropriate at the motion to dismiss stage before the development of a factual record. *See Chapman*, 2015 WL 4509871, at *15, *17 (concluding that allegations of an unconstitutional custom of deliberate indifference to excessive force were sufficient notwithstanding that complaint did not make clear "the precise circumstances surrounding the three citizen encounters with BPD officers, and the extent to which the alleged use of force in those matters may have been justified"). Accordingly, Plaintiff's *Monell* claim may proceed on a condonation theory.

### iii.    Failure to Supervise

To establish *Monell* liability under a failure to supervise theory, a plaintiff must allege that (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct posing a "pervasive and unreasonable risk" of constitutional injury, (2) the supervisor's response was so inadequate as to demonstrate deliberate indifference to or tacit authorization of the conduct, and (3) there existed an "affirmative causal link" between the supervisor's inaction and the

plaintiff's injury. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Consistent with *Monell* liability generally, a Plaintiff must allege that the municipality has adopted a widespread practice or custom of failing to supervise its officers. *Cottman v. Balt. Police Dep't*, Civ. No. 21-cv-00837-SAG, 2022 WL 137735, at *8 (D. Md. Jan. 13, 2022).

A failure to supervise may support *Monell* liability only when there exists "a history of widespread abuse" such that knowledge may be imputed to supervisory personnel. *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983). Courts in this District have consistently refused to dismiss failure to supervise claims when plaintiffs allege such a history of pervasive misconduct. *See Shipley v. Disney*, Civ. No. SAG-21-3173, 2022 WL 2789076, at *13 (D. Md. July 15, 2022) (denying motion to dismiss for failure to supervise claim when plaintiff alleged a history of widespread misconduct and the BPD's failure to discipline any officers for that misconduct); *Cottman*, 2022 WL 137735, at *9–10 (concluding that allegations of pervasive misconduct were sufficient to raise inferences of constructive knowledge and deliberate indifference to support a failure to supervise claim); *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 536–37 (D. Md. 2020) (denying motion to dismiss claim based on failure to supervise when plaintiff paired general allegations that the BPD failed to adequately supervise officers with allegations of widespread misconduct).

For largely the same reasons discussed above regarding Plaintiff's condonation theory, Plaintiff has sufficiently pled a failure to supervise theory. Although many of Plaintiff's references to this theory broadly allege that the BPD failed to adequately supervise its officers, *see, e.g.*, ECF 3 at ¶¶ 85, 92, 96, 202–05, the complaint pairs those allegations with more detailed allegations of previous misconduct, as in *Washington*. As discussed above, Plaintiff has pled a history of officer use of excessive force that is sufficiently widespread to give rise to the inferences that (1) the BPD

had constructive knowledge of it, (2) the BPD was deliberately indifferent to it, and (3) a causal link existed between it and the death of Mr. Rochester. Furthermore, Plaintiff has also alleged specific ways in which the BPD failed to adequately supervise its officers, such as failing to collect and analyze data on the use of force and failing to investigate complaints. *Id.* at ¶¶ 92–94; *see also Paylor v. Balt. Police Dep't*, Civ. No. 1:24-cv-02746-JRR, 2025 WL 2306236, at *13 (D. Md. Aug. 11, 2025) (concluding that allegations that "BPD supervisors were inexperienced, not properly trained, unwilling to examine the behavior of subordinates, and knew that their subordinates [engaged in misconduct] but did nothing to stop it" were sufficient because, although broad, they amounted to more than "a conclusory assertion that supervision was inadequate" and instead delineated specific ways in which it was so). Accordingly, Plaintiff's *Monell* claim may proceed on a failure to supervise theory as well.

### 3. Indemnification

The BPD next argues that this Court should dismiss Plaintiff's indemnification claim because it is not yet ripe, as this Court has not yet entered any judgment against Defendant Murray. The LGTCA provides that any "local government," such as the BPD, "shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment." Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1). Importantly, the LGTCA bars the relevant entity from asserting sovereign immunity as a defense to its indemnification obligation. *See* § 5-303(b)(2); *see also Cherkes*, 140 Md. App. at 323 ("[T]he General Assembly waived the BCPD's common law State sovereign immunity only to the extent of the statutory duties to defend and indemnify."). Furthermore, in *Johnson v. Francis*, the Maryland Court of Special Appeals considered, and rejected, the argument that no individual plaintiff may sue the BPD directly for indemnification. 239 Md. App. 530 (2018). The Court of

Special Appeals reasoned that "[w]hen read in the context with the statute, the local government's obligation under § 5-303(b)(1) unambiguously runs directly to the underlying plaintiff." *Id.* at 551. The court therefore specifically held that the LGTCA permits plaintiffs to sue local government agencies directly for indemnification of harms caused by one of the agency's employees acting within the scope of their employment. *Id.* at 555.

The decision in *Johnson v. Balt. Police Dep't*, Civ. No. ELH-19-00698, 2020 WL 1169739 (D. Md. Mar. 10, 2020), is on all fours. In that case, an exonerated Baltimore City prisoner, Jerome Johnson, sued the BPD and four BPD detectives for his wrongful murder conviction. *Id.* at *1. Mr. Johnson brought § 1983 claims against the detectives and a *Monell* claim against the BPD. *Id.* Mr. Johnson also pled an indemnification claim against the BPD. *Id.* The BPD argued that the indemnification claim was premature, because there was no judgment against any detective, or a finding that any detective was acting within the scope of their employment with the BPD. *Id.* at *37.

The court rejected these arguments. *Id.* at *38. Collecting a number of cases from Maryland's appellate courts, the court first concluded that there is no case law "preclud[ing] a plaintiff from pleading an indemnification claim before final judgment." *Id.* (citations omitted). Next, the court found that, while some courts have dismissed indemnification claims against the BPD as premature, under the circumstances of Mr. Johnson's case, "permitting [him] to plead an indemnification claim against the BPD at the outset avoids the possibility of redundant litigation, thereby facilitating the efficient resolution of this case." *Id.* The court continued:

> Indeed, for that reason, courts in this District have permitted the BPD to file a cross-claim for indemnification against an officer under [Federal Rule of Civil Procedure] 13(g), seeking a declaration that it has no duty to indemnify despite the officer's liability not having been established. *See Bumgardner v. Taylor*, GLR-18-1438, 2019 WL 4115414, at *11 (D. Md. Aug. 29, 2019) (finding that "permitting BPD's Cross-Claim to proceed directly behind [the plaintiff's] claims serves the purposes

of Rule 13(g)"); *Harrod v. Mayor & City Council of Balt.*, GLR-18-2542, 2019 WL 5636392, at *4 (D. Md. July 24, 2019) (same). That approach makes good sense where, as here, "[d]etermining whether [the] Officer Defendants were acting within the scope of their employment will, in turn, determine whether BPD is liable for [the] Officer Defendants' actions." *Bumgardner*, 2019 WL 4115414, at *11.

*Id.*

Similarly, here, Plaintiff has lodged a *Monell* claim directly against the BPD, as well as several claims against Defendant Murray, a BPD employee. Thus, to facilitate an efficient resolution of this case, and to avoid "the possibility of redundant litigation," the Court concludes that dismissal of Plaintiff's indemnification claim would be improper at this time. *Id.* However, to the extent that any discovery would be required solely for the adjudication of the indemnification claim, it makes sense to stay the claim pending resolution of the claims against Defendant Murray, absent specific permission from this Court to conduct the discovery sooner. *See, e.g.*, *McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 288 (D. Md. 2020).

### 4.  Punitive Damages

Finally, the BPD asserts that Plaintiff may not seek punitive damages, and this Court agrees. A municipality is immune from punitive damages in a § 1983 action. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Plaintiff does not dispute this immunity but contends that punitive damages may be available for other claims against the BPD. However, this Court has concluded that it must dismiss all of Plaintiff's substantive claims against the BPD other than the *Monell* claim. Accordingly, Plaintiff may not seek punitive damages.

Accordingly, this Court will dismiss all claims against the BPD except for the *Monell* claim, which may proceed on condonation and failure to supervise theories, and the indemnification claim.

### B.  Claims Against the City

This Court will dismiss all of the claims against the City. As discussed, at the time of the events underlying this lawsuit, the BPD existed as a state agency. *Strohman*, 6 F. Supp. 3d at 642. The City therefore does not employ BPD officers and is not liable for their conduct under state law. *Id.* at 644. Thus, Plaintiff cannot sustain state law claims against the City.

Nor can Plaintiff sustain a § 1983 action against the City based on the conduct of a BPD officer. Courts in this District have repeatedly concluded that BPD officers, at the relevant time, were "state employees free from the City's supervision and control." *Id.* at 646; *see also Chin v. City of Baltimore*, 241 F. Supp. 2d 546, 549–50 (D. Md. 2003); *Bradley v. Balt. Police Dep't*, 887 F. Supp. 2d 642, 647 (D. Md. 2012); *Nicholson v. Balt. Police Dep't*, Civ. No. DKC 20-3146, 2021 WL 1541667, at *10 (D. Md. Apr. 20, 2021); *Fish v. Mayor of Balt.*, Civ. No. CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018).

Plaintiff notes that courts have repeatedly concluded that the BPD does not operate as an "arm of the state" for purposes of Eleventh Amendment immunity and argues that the analysis in those cases compels the conclusion that the City controls the BPD. The Eleventh Amendment and *Monell* inquiries are different, though. *See Strohman*, 6 F. Supp. 3d at 645–46 (describing cases that have conflated the two analyses and declining to follow them). In analyzing whether an entity constitutes an "arm of the state" and would, as such, enjoy Eleventh Amendment immunity, courts consider several factors, including whether the state would pay any judgment against the entity, the entity's degree of autonomy, whether the entity is involved with state or non-state concerns, and how state law regards the entity. *United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 (4th Cir. 2012). *Monell*, in turn, requires proof of a constitutional violation caused by the policy, custom, or practice of a municipality. 436 U.S. at 694. Thus, an

entity may fail to constitute an "arm of the state" under the *Oberg* factors but still lack sufficient municipal control to permit a plaintiff to establish *Monell* liability.

Consistent with the cases cited above, this Court similarly concludes that, in 2022, the City did not exert sufficient control over the BPD to permit *Monell* liability. In advancing her argument, Plaintiff acknowledges that "the City exercises no managerial control over the BPD's day-to-day operations" and "the City does not train or supervise BPD officers." ECF 23 at 23–24 (quoting *Johnson*, 2020 WL 1169739, at *27). Indeed, the City could not, as a matter of law, have regulated the BPD. *See* Cherkes, 140 Md. App. at 428 ("[N]o ordinance of the City or Act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner.") (quoting Balt. City Charter, Art. II, § 27). Because the City did not control the BPD and did not train or supervise BPD officers at the times pertinent to this case, Plaintiff cannot, as a matter of law, satisfy the requirements of her *Monell* claim. Furthermore, because the City is not liable for the conduct of BPD officers, it has no obligation to indemnify any BPD officer for a judgment rendered against him. *See Grim*, 2019 WL 5865561, at *27.

### C.  Claims Against the State

The State contends that state sovereign immunity bars all of the claims that Plaintiff raises against it, and this Court agrees. Unless waived, state sovereign immunity precludes actions against the State of Maryland or its agencies. *Strohman*, 6 F. Supp. 3d at 642. The Maryland Tort Claims Act ("MTCA") waives the State's sovereign immunity in part as to the tortious conduct of delineated "state personnel." Md. Code, State Government, § 12-101; *see also Nicholson*, 2021 WL 1541667, at *5. BPD officers are not "state personnel" for the purposes of the MTCA. *Id.* In reviewing the legislative history of the MTCA, Maryland courts have concluded that, after *Clea v. Mayor of Balt.*, 312 Md. 662 (1988), raised the possibility that the state might be liable for the

conduct of BPD officers, the General Assembly amended the MTCA. *Houghton v. Forrest*, 412 Md. 578, 589 (2010); *see also Cherkes*, 140 Md. App. at 325. The General Assembly removed BPD officers from the definition of "state personnel" in the MTCA and shortly thereafter added the BPD to the definition of "local government" in the LGTCA such that the BPD itself must pay the judgments entered against its officers. *Houghton*, 412 Md. at 589; *see also Cherkes*, 140 Md. App. at 325. Because neither the MTCA nor any other law has waived the State's sovereign immunity as to the state law claims that Plaintiff raises here, those claims must be dismissed. *See Nicholson*, 2021 WL 1541667, at *2, *5 (dismissing all state law claims against the State, including direct claims and those based on *respondeat superior*, because of state sovereign immunity). Because this Court will dismiss all claims against the State on sovereign immunity grounds, it need not address the State's other asserted grounds for dismissal.

### D. Claims against Defendant Murray

#### 1. Official capacity

Defendant Murray first argues that to the extent Plaintiff brings the § 1983 claim in Count III against him in his official capacity, it must be dismissed as duplicative of the § 1983 claim in Count IX, and this Court agrees. Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell*, 436 U.S. at 690 n.55). If the government entity receives notice and an opportunity to respond, an official-capacity suit is treated as a suit against the government entity itself. *Id.* at 166. An official-capacity suit therefore requires proof that the entity's policy or custom caused the injury pursuant to *Monell*. *Id.* Accordingly, if a plaintiff brings an identical claim against both a municipal official in his official capacity and the municipality itself, the claim against the official is "redundant." *Corral v. Montgomery County*, 4 F. Supp. 3d

739, 748 (D. Md. 2014) (granting summary judgment in favor of county officials sued in their official capacity under § 1983 because it duplicated § 1983 claim against county that could proceed). Because Plaintiff has brought a § 1983 claim against the BPD, of which Defendant Murray is an agent, and this Court has concluded that that claim may proceed, the § 1983 claim against Defendant Murray in his official capacity is duplicative as it would require proving the same *Monell* liability by the BPD. Thus, this Court will dismiss Count III to the extent it is brought against Defendant Murray in his official capacity.

2.  Public official immunity

Defendant Murray next argues that public official immunity shields him from the negligence claim raised against him. Maryland courts have long recognized the common law doctrine of public official immunity. *See e.g.*, *James v. Prince George's County*, 288 Md. 315, 323 (1980). Public official immunity is "generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct." *Lee v. Cline*, 384 Md. 245, 258 (2004). The immunity typically applies in cases involving "a tort claim based upon [an] alleged mis-judgment or a negligent exercise of judgment," and is "intended to be a defense against claims that a 'better choice' could have been made." *Id.* at 261.

For public official immunity to apply, it must be shown that (1) the actor is a public official, "rather than a mere government employee or agent"; (2) the alleged tortious conduct "occurred while the actor was performing discretionary, as opposed to ministerial, acts"; and (3) the actor committed the relevant acts "within the scope of his official duties." *Thomas v. City of Annapolis*, 113 Md. App. 440, 452 (1997).

Once those three conditions are met, "the public official enjoys a qualified immunity." *Id.* That immunity is defeated if the actor performed the relevant acts with "malice," *id.*, acts with

"gross negligence," *Cooper v. Rodriguez*, 443 Md. 680, 723 (2015), commits an intentional tort, *Houghton*, 412 Md. at 588, or commits a state constitutional tort, *Ritchie v. Donnelly*, 324 Md. 344, 370 (1991). "Actual malice is established by proof that the defendant-officer 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Bord v. Baltimore County*, 220 Md. App. 529, 557 (2014) (quoting *Town of Port Deposit v. Petetit*, 113 Md. App. 401, 416 (1997)); *see also Hines v. French*, 157 Md. App. 536, 562-63 (2004) (characterizing this definition as the standard for "malice" for the purposes of public official immunity). The "mere assertion" that a defendant performed an act with malice will not suffice; rather, the plaintiff "must allege with some clarity and precision those facts which make the act malicious." *Penhollow v. Bd. of Comm'rs*, 116 Md. App. 265, 294 (1997).

Law enforcement officers constitute public officials for purposes of common law public official immunity. *Smith v. Danielczyk*, 400 Md. 98, 128–29 (2007). Officers acting within the scope of their law enforcement functions act in a discretionary capacity. *Cherkes* 140 Md. App. at 329. The complaint alleges that, at all times pertinent to this case, Defendant Murray was acting within the scope of his employment. ECF 3 at ¶ 20. The conditions for public official immunity thus apply to Defendant Murray's conduct, and Plaintiff does not dispute that they do; rather, she argues that she has sufficiently pled malice.[1]

---

[1] Plaintiff also argues that she has pled allegations supporting gross negligence to overcome public official immunity. Plaintiff in fact separately pled a claim for gross negligence in Count VII, which Defendant Murray has not moved to dismiss on the basis of public official immunity. This Court will therefore limit its analysis to whether Plaintiff has sufficiently pled malice to overcome public official immunity as to her claim for negligence.

This Court disagrees. The complaint contains numerous allegations phrased in terms of "Defendant Murray negligently and/or gross negligently and/or intentionally and/or maliciously." *Id.* at ¶¶ 63–68, 76–78. All of these allegations are conclusory. As discussed, Plaintiff must plead specific facts that would raise an inference that Defendant Murray acted with "an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure" Mr. Rochester. *See Bord*, 220 Md. App. at 557 (quoting *Town of Port Deposit*, 113 Md. App. at 416; *see also Rodwell v. Wicomico County*, Civ. No. DKC 22-3014, 2024 WL 1178202, at *7 (D. Md. Mar. 19, 2024) (concluding that plaintiff had sufficiently pled malice by alleging that while he was experiencing a seizure, officers piled on top of him and repeatedly shoved him to the ground for nearly thirty minutes). Plaintiff has failed to plead with any specificity any factual allegations that would raise such an inference.

Plaintiff further argues that this claim should proceed regardless of whether public official immunity applies because, according to Plaintiff, either public official immunity does not apply and Defendant Murray is personally liable for a judgment entered against him, or it does apply and the BPD must indemnify Defendant Murray pursuant to the LGTCA. This seemingly novel argument is unpersuasive. Public official immunity constitutes a "threshold issue that, once established, defeats a claim without inquiry into the underlying merits." *Livesay v. Baltimore County*, 384 Md. 1, 10 (2004). As discussed above, the LGTCA explicitly states that it does not waive any common law immunity except for immunity from defending or indemnifying an employee. § 5-303(b)(2), (d). Thus, the LGTCA does not waive public official immunity, and it is available to Defendant Murray regardless of whether, if it were not available, he or the BPD would be liable for a judgment against him. *See Livesay*, 384 Md. at 11 (explaining that, under the LGTCA, although the local government must indemnify its employee, the claim remains subject

to any valid immunity possessed by the employee). Furthermore, the LGTCA permits a local government to assert on its own behalf any common law immunities possessed by its employee for whose conduct the claim against the local government is premised. § 5-303(e); *see also Est. of Taylor v. Baltimore County*, Civ. No. RDB-22-2459, 2024 WL 308953, at *4 (D. Md. Jan. 26, 2024) (dismissing claim against county because county could assert same public official immunity to which its employee was entitled). If public official immunity served only to protect employees from personal liability, as Plaintiff appears to assert, it would make little sense to allow a local government to assert the immunity on its own behalf. Because Defendant Murray is entitled to public official immunity, this Court will dismiss Count VI as to him.

### 3. Failure to State a Claim of Excessive Force

Defendant Murray next contends that Plaintiff has failed to state of claim of excessive force. The Fourth Amendment requires every seizure to be carried out in a reasonable manner. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (explaining that the Fourth Amendment protects against "physically intrusive conduct" during police apprehension). Although "an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *id.* at 396, the Fourth Amendment prohibits police from "using excessive force to seize a free citizen," *Hupp v. Cook*, 931 F.3d 307, 321 (4th Cir. 2019). Whether force is excessive is determined by asking "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Id.* at 321–22. To answer, the court analyzes three factors identified by the Supreme Court in *Graham*: (1) "the severity of the crime at issue," (2) whether there was "an immediate threat to the safety of the officers or others," and (3) whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. These factors are not exclusive, however, and there may exist

other circumstances relevant to the analysis. *Kingsley v. Hendricks*, 576 U.S. 389, 397 (2015). For example, the court should also consider "the proportionality of the force in light of all the circumstances," *Waterman v. Batton,* 393 F.3d 471, 481 (4th Cir. 2005), and the extent of the injuries sustained, *Hupp*, 931 F.3d at 322. In analyzing the reasonableness of an officer's decision, the court must give due regard to "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Regarding the first factor, the severity of the crime, Mr. Rochester had open warrants for failure to appear involving underlying charges of carjacking and robbery. It is not clear from the complaint, however, whether Defendant Murray was aware of these charges. The complaint alleges that Officers Mauri and Galloway ran Mr. Rochester's plate and discovered the warrants and then conveyed that information over the radio. Drawing all reasonable inferences in Plaintiff's favor at this stage, it is not clear that Defendant Murray heard this information over the radio and thus had any knowledge of the severity of the crime when he made the use of force determination. This Court therefore does not consider this factor in the reasonableness analysis.

Plaintiff does not dispute, regarding the third factor, that Mr. Rochester was attempting to evade arrest by flight. Regarding the extent of Mr. Rochester's injuries, they could not have been more significant. *See Tennessee v. Garner*, 471 U.S. 1, 9 ("The intrusiveness of a seizure by means of deadly force is unmatched.").

The parties primarily debate the analysis of the second factor, whether there existed an immediate threat to the safety of the officers or others. Plaintiff urges this Court to consider within that analysis the fact that, according to her, Defendant Murray violated several BPD policies and created any threat that existed by running in front of Mr. Rochester's car. Within the Fourth Circuit,

courts do not consider "the reasonableness of the officer's actions in creating the dangerous situation." *Waterman*, 393 F.3d at 477. The Supreme Court was asked to consider the validity of such a rule barring consideration of that factor in its decision this year in *Barnes v. Felix*, but it declined to do so. 605 U.S. 73, 83–84 (2025). This Court therefore will not consider any role Defendant Murray allegedly had in creating any threat but still concludes, for the reasons explained below, that Plaintiff has stated a plausible claim.

Plaintiff contends that the Fourth Circuit's decision in *Waterman v. Batton* controls, and this Court agrees. That case involved a vehicle chase in which one of the chasing officers radioed, in a communication heard by all officers involved, that the suspect had "tried to run [the officers] off the road." *Waterman*, 393 F.3d at 474. After the suspect's vehicle briefly slowed, it accelerated forward with several officers positioned sufficiently close to the vehicle that the suspect could have run them over in approximately one second. *Id.* at 474–75. The officers began firing at the vehicle, which passed them without hitting them, and the officers then continued to fire at the passenger side and rear of the vehicle. *Id.* at 475. Approximately six seconds elapsed between the vehicle's acceleration and the final shot. *Id.* The suspect died from the gunshot wounds he sustained. *Id.*

The Fourth Circuit concluded that although the officers' use of force when the vehicle first accelerated toward them was reasonable, continued shooting after the vehicle had passed them was not. *Id.* at 480, 482. The court reasoned that a reasonable officer could have interpreted the acceleration as an attempt to use the vehicle as a weapon, and the Fourth Amendment did not require the officers to take the chance that the suspect intended to accelerate the vehicle *at* them rather than *by* them. *Id.* at 478–79. The court then concluded, however, that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force

has been eliminated." *Id.* at 481.[2] Applying that principle, the court determined that after the vehicle had passed the officers, there no longer existed a threat to their safety that could justify the subsequent shots. *Id.* at 482.

This Court agrees with Plaintiff that the facts here closely resemble those in *Waterman*. Like the officers in *Waterman* who were positioned such that the vehicle could have hit them when it first accelerated, Defendant Murray was positioned in front of Mr. Rochester's vehicle when it began moving and could have reasonably concluded as it began to move that Mr. Rochester intended to hit him rather than pass him. And as the officers in *Waterman* continued to fire at the passenger side and rear of the vehicle after it had passed without hitting them, Plaintiff alleges that Defendant Murray fired the fourth, fatal shot at the passenger side of Mr. Rochester's vehicle after the front of the vehicle had already passed him without hitting him.

Indeed, the Fourth Circuit has concluded that an officer who fires at a vehicle in that circumstance, when it is passing him and no longer in a position to hit him, violates the Fourth Amendment. *See Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019). Although neither party discusses *Williams v. Strickland*, its facts even more closely resemble those here. In that case, the

---

[2] This Court discerns no tension between this conclusion and the Supreme Court's recent decision in *Barnes*. In that case, the Court considered a rule that limited the reasonableness analysis to consideration of those circumstances existing at the precise moment that an officer perceives the threat that prompts them to employ force. *Barnes*, 605 U.S. at 76. The Court rejected such a rule because a court "cannot review the totality of the circumstances if it has put on chronological blinders." *Id.* at 82. The Fourth Circuit's conclusion in *Waterman* that force may be justified in one moment and not in the next is consistent with this analysis. Indeed, rather than limiting its consideration to the circumstances existing at the moment that officers first employed force in *Waterman*, the Fourth Circuit considered the encounter as a whole and how circumstances might change throughout the encounter. 393 F.3d at 481 ("To simply view all of the force employed in light of only the information possessed by the officer when he began to employ force would limit, for no good reason, the relevant circumstances to be considered in judging the constitutionality of the officer's actions.").

plaintiff drove his vehicle toward the defendant officer, who began firing at the vehicle. *Williams*, 917 F.3d at 766. It was unclear at the summary judgment stage whether the car was still driving toward the officer, was passing by him such that "he was alongside the car and out of the car's trajectory," or had already passed him, when he started shooting. *Id.* Relying on *Waterman*, the Fourth Circuit "had no difficulty concluding" that if the officer had started or continued to fire at the vehicle after he was no longer in its trajectory, he had used excessive force. *Id.* at 769. Just like in *Williams*, Plaintiff has alleged that Defendant Murray fired the fatal shot while "he was alongside the car and out of the car's trajectory." *Id.* at 766; *see also Krein v. Price*, 596 Fed. App'x 184, 186, 190 (4th Cir. 2014) (denying summary judgment because a reasonable factfinder could conclude that an officer's second shot through a vehicle's passenger-side window after "tak[ing] a quick step to his right" constituted excessive force because "he was on the passenger side of the vehicle and therefore no longer in danger of being hit"). Thus, Plaintiff has stated a plausible claim of excessive force.

This Court remains mindful of both the speed with which the events here transpired and the difficulty in making split-second decisions in potentially life-threatening circumstances. Those considerations were present in *Waterman* too, however, and the Fourth Circuit recognized that force may be justified at one point and not justified "even seconds later." 393 F.3d at 482. And although Defendant Murray correctly notes that the events occurred even more quickly here (two seconds between Mr. Rochester's vehicle moving and the final shot) than in *Waterman* (six seconds between the vehicle accelerating and the final shot), that fact does not defeat Plaintiff's claim at this stage. Particularly in light of the implication from *Williams* that the distinction between justified and unjustified force may exist in the moment when a vehicle is in the process

of passing an officer, Plaintiff has more than satisfied her burden of stating a claim of excessive force.

### 4.  Qualified immunity

Defendant Murray argues that even if Plaintiff has stated a plausible § 1983 claim for excessive force, he is entitled to qualified immunity as to that claim. Qualified immunity shields a government official from civil damages in a § 1983 action if the official's conduct does not violate clearly established law. *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013). In determining whether an official is entitled to qualified immunity, a court must consider (1) whether the official violated the plaintiff's constitutional right and (2) whether the right was clearly established at the time of the alleged conduct. *Id.* A right is clearly established if an objectively reasonable officer in the defendant's shoes would recognize that their conduct violates the right. *Somers v. Devine*, 132 F.4th 689, 696 (4th Cir. 2025). A court examines the right in question at a "high level of particularity" without demanding exactitude. *Id.* (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir. 1999)). "In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two." *Williams*, 917 F.3d at 770. Accordingly, a court need not have held unlawful the exact conduct at issue, but the existing authority, shown through either controlling authority in the jurisdiction or a "consensus of cases of persuasive authority," must make manifest that the alleged conduct was unlawful. *Waterman*, 393 F.3d at 476 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The burden of establishing the qualified immunity defense rests on the party seeking to invoke it. *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019).

As this Court has already explained, Plaintiff has sufficiently alleged a violation of the Fourth Amendment. Furthermore, that right was clearly established at the time of the incident here.

In *Williams*, the Fourth Circuit concluded that it need employ "no subtle line-drawing" because the facts of that case fell "well within" those of *Waterman*. 917 F.3d at 770. As both *Waterman*, in 2005, and *Williams*, in 2019, clearly established before this incident:

> (1) law enforcement officers may—under certain conditions—be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them, but (2) the same officers violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the car's trajectory.

*Williams*, 917 F.3d at 770 (citing *Waterman*, 393 F.3d at 480–82). The facts alleged here similarly fall "well within" that clearly established law. Like *Williams*, this case involves an officer who allegedly fired while "he was alongside the car and out of the car's trajectory" as it was passing him. 917 F.3d at 766. Thus, at this stage, Defendant Murray has not met his burden to establish that he is entitled to qualified immunity, but he may raise the defense again at the summary judgment stage.

### 5.    State Law Claims

Defendant Murray also contends that Plaintiff has failed to state related state law claims. Articles 24 and 26 of the Maryland Declaration of Rights are read in *pari materia* with the Fourteenth Amendment and the Fourth Amendment of the United States Constitution respectively. *Littleton v. Swonger*, 502 Fed. App'x 271, 274 (2012). A court therefore analyzes excessive force claims brought under the Maryland Declaration of Rights using the same standard as it would to analyze an excessive force claim brought under the federal Constitution. *Est. of Blair v. Austin*, 469 Md. 1, 22–23 (2020).

This same standard also applies to Plaintiff's common law claims of battery and gross negligence. Under Maryland law, battery is "the unlawful application of force to the person of another." *Snowden v. State*, 321 Md. 612, 617 (1991). An officer's use of excessive, or unlawful,

force, will therefore constitute battery. *French v. Hines*, 182 Md. App. 201, 265–66 (2008). Similarly, the *Graham* reasonableness standard applies to gross negligence claims premised on excessive force. *Richardson v. McGriff*, 361 Md. 437, 452–53 (2000); *see also Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (concluding that because plaintiff had stated a claim for excessive force in violation of the Fourth Amendment, he had also stated claims for battery and gross negligence). Because this Court has concluded that Plaintiff has stated an excessive force claim under the Fourth Amendment, she has also stated an excessive force claim under Articles 24 and 26 and claims for battery and gross negligence.

Defendant Murray also argues that Plaintiff's wrongful death claim should be dismissed. He contends that because he did not employ excessive force, he did not commit a wrongful act that could support such a claim. Pleading a wrongful death claim under Maryland law requires that the plaintiff allege, among other things, that the defendant's wrongful act proximately caused death. *Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 175 (D. Md. 2023). Because this Court has concluded that Plaintiff has sufficiently stated a claim for excessive force, she has also sufficiently stated a claim for wrongful death based on that excessive force, or wrongful act.

Finally, Defendant Murray contends that Count II, which is titled "Survivorship Claim," should be dismissed because it does not constitute an independent cause of action. This Court agrees. Maryland's so-called "survival statute," Md. Code Ann. Est. & Trusts § 7-401(y), authorizes the personal representative of a decedent's estate to commence an action that the decedent could have filed if the decedent had lived. It does not require that the complaint expressly allege reliance on the survival statute, nor does it require a separate claim or count bringing a "survival action" or "survivorship claim." In fact, it creates no independent cause of action as it serves merely as the mechanism to bring claims that the decedent could have brought. *Est. of*

*Green*, 696 F. Supp. 3d at 176. Plaintiff has brought several claims as the personal representative of Mr. Rochester's estate as part of a survival action, but she need not plead survivorship as an independent claim. Thus, Count II will be dismissed as it fails to state an independent claim.

### IV.   CONCLUSION

For the reasons stated above, this Court will grant the City's, ECF 10, and the State's, ECF 11, motions to dismiss. Because no viable claims remain against the City or the State, they are dismissed from this action. The BPD's motion to dismiss, ECF 9, is denied as to Counts IX and XI but granted as to all other claims. Defendant Murray's motion to dismiss, ECF 12, is granted as to Count II, Count III to the extent it is brought against him in his official capacity, and Count VI, but denied as to all other claims. A separate Order follows.

Dated: October 8, 2025

                                    _____/s/_____
                                      Stephanie A. Gallagher
                                      United States District Judge